**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joe RUSSO et al., Defendants-Appellants.**

**No. 71–2390**

**Summary Calendar.**[*]

United States Court of Appeals, Fifth Circuit.

Feb. 22, 1972.

Rehearings Denied March 21 and April 4, 1972.

Ray Sandstrom, Sandstrom & Hodge, Ft. Lauderdale, Fla., for Rodovich & Wade.

Joel D. Robrish, Miami, Fla., for Russo & Holet.

---

[*] Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5th Cir., 1970, 431 F.2d 409, Part I.

Robert W. Rust, U. S. Atty., Jerome B. Ullman, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before WISDOM, GODBOLD and RONEY, Circuit Judges.

GODBOLD, Circuit Judge:

The evidence in this case showed that in late September 1970 defendant Rodovich and a friend, Calarusse, passed approximately $2,000 in counterfeit money on a trip from Miami to Connecticut and were arrested in Connecticut. The Connecticut charges relate to this case only in an evidentiary sense.

The two returned to Miami, and Calarusse began to cooperate with United States Secret Service Agents. He arranged for a meeting on October 1 between Rodovich and undercover agent Ward, who at that meeting made a buy from Rodovich of $2,060 counterfeit currency. Ward negotiated with Rodovich for a larger buy at a future time. Rodovich revealed that he was dealing with an out of town source of supply but mentioned no names. Thereafter Rodovich, not knowing that he was dealing with Secret Service Agents, communicated directly with Ward and a second undercover agent, D'Amelio, who Ward introduced to Rodovich as his (Ward's) source of funds to buy the bogus money.

As a result of these dealings, a large buy was arranged for November 10 at the Miami airport. Rodovich, Ward and D'Amelio met at the terminal. Rodovich made a telephone call from a pay phone, and after a few minutes received a call at that same phone. He then told the agents the money was being brought to the airport. About 45 minutes later, and immediately after a car identified only as bluish in color had stopped at the terminal door, Russo and Holet entered the terminal bearing a suitcase which, it later developed, contained $250,000 of counterfeit bills. They met Rodovich, and the suitcase was put in a locker. While Holet and Russo remained close by, Rodovich took Ward to the locker and they examined the contents of the suitcase. Rodovich, Ward, and D'Amelio then went to another locker nearby where genuine money to make the buy had been placed. As the three of them were at this locker, and Russo and Holet were standing nearby, Wade entered and approached Holet and asked, "How did everything go? Did you get the money yet?" A few moments later the numerous surveilling agents arrested the four defendants and made sham arrests of the two undercover men.

Wade was searched and found to have in his pocket a slip of paper with the telephone number of the pay station at which Rodovich had made and received his calls, and car keys which were found to be those for Russo's blue car, parked at the airport.

All defendants were convicted of conspiracy to violate the counterfeit laws. Rodovich was convicted also of possessing and delivering the $2,660 which he sold to Ward on October 1. Russo was convicted also of possessing two bogus bills found in his pocket when he was arrested.

Rodovich asserted the defense of entrapment and on appeal claims there was entrapment as a matter of law. He took the stand and testified only as to his dealings with Calarusse which led to the October 1 sale to Ward. On cross-examination he admitted passing counterfeit money on the trip to Connecticut with Calarusse.

■ Rodovich was not, as a matter of law, entrapped. There was sufficient evidence of governmental inducement to put upon it the burden of proving that the inducement did not overpersuade or undermine the will of an unwilling man. But the evidence of predisposition, in the form of passing counterfeit money during the trip to Connecticut, was sufficient to carry the entrapment issue to the jury. Pierce v. United States, 414 F.2d 163 (5th Cir.), cert. denied, 396 U. S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969).

■■ There was no error in the denial of severance motions made by the

other three defendants after Rodovich made known that he would rely upon the defense of entrapment, which, under the law in this circuit, prevented him from denying the acts constituting the offense. The fact that a codefendant, charged as a coconspirator, pleads entrapment does not alone require the trial judge to serve all others charged with the conspiracy. Rodovich testified to nothing occurring after October 1, and he did not mention Wade, Holet or Russo in his testimony. The government asked him no questions about the airport meeting, or any other questions tending to implicate Rodovich with any of the other three defendants. Thus, while the entrapment defense barred Rodovich from denying the commission of acts constituting the offense, at no point did he make affirmative statements implicating any of the other defendants.

Also Wade, Russo and Holet would have been little, if any, better off had any one or all been tried separately. The evidence still would have placed all at the airport under the surveillance of a number of agents, in a meeting in which Rodovich was caught red-handed receiving from two of them a delivery of counterfeit money and in turn delivering it to the two undercover men. The possibility of Rodovich's not being called to the stand in a separate trial could have no real possibility of affecting the result.

Wade suggests that Rodovich's taking the stand to testify in support of the entrapment defense emphasized his own failure to take the stand to explain his presence at the airport. This contrast is true as to any codefendant and hardly justifies a severance. The same attorney represented Rodovich and Wade. In an abstract sense there was a conflict between Rodovich's interest in testifying as a predicate to his entrapment defense and Wade's interest in Rodovich's remaining silent. But, for the same reasons already discussed, the conflict had only the most remote possible effect on Wade—speaking or silent, Rodovich had been caught in the act. Also on two occasions during Rodovich's testimony the trial court, upon request, told the jury that the testimony was to be considered only as to Rodovich. There was no *De Luna* problem [1]—the counsel for Wade and Rodovich drew no attention to Wade's failure to testify. There was no abuse of discretion in refusing severance as to any of the defendants. United States v. Levrie, 445 F.2d 429 (5th Cir. 1971).

Wade's approach to Holet at the airport, and the question addressed by him to Holet, gave probable cause to arrest Wade. The subsequent search of Wade was, therefore, valid.

No other points deserve discussion.

Affirmed.

[1]. De Luna v. United States, 308 F.2d 140 (5th Cir. 1962).