**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Francisco PENTADO et al., Defendants-**
**Appellants.**

**No. 71–1612.**

United States Court of Appeals,
Fifth Circuit.

June 7, 1972.

Rehearing and Rehearing En Banc
Denied July 18, 1972.

Milton E. Grusmark, Miami Beach, Fla., for Alonso and Pentado.

Sam W. Kleinfeld, Richard M. Gale, Miami, Fla., for Rosquette and Noa.

Gino P. Negretti, Miami, Fla., for Ochoa, Patino and Lieros.

Robert W. Rust, U. S. Atty., Harold F. Keefe, Miami, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Appellants Rafael Patino, Benito Alonso, Manuel Noa, Eduardo Ochoa, Francisco S. Pentado, Rene A. Rosquette, and Claudine Lieros appeal from their joint trial and jury conviction for trafficking in heroin contrary to 21 U.S.C. § 174 and 26 U.S.C. §§ 4704(a) and 4705 (a). All seven appellants contend that the jury was improperly constituted;

that heroin was seized as a result of an illegal search; that certain firearms were erroneously admitted into evidence; and that the court improperly instructed the jury on the issue of conspiracy. Appellants Alonso and Pentado argue that the evidence against them was insufficient to sustain their convictions and that the trial court erroneously refused to sever appellant Ochoa who asserted the defense of entrapment during the trial. Appellants Rosquette, Noa, and Patino claim they were arrested without probable cause. Appellant Rosquette contends individually that the evidence was insufficient to sustain his conviction and that his right to a fair trial was violated by a prejudicial statement from a government witness. And finally, appellant Noa contends he was also prejudiced by the statement concerning Rosquette. After considering each of these assignments of error we affirm the holding of the district court.

The events which led to the arrest of defendants began on November 20, 1970, when federal agent Peter Scrocca of the Bureau of Narcotics and Dangerous Drugs (BNDD) met with defendant Ochoa in New York City to negotiate the purchase of some narcotics. Acting in an undercover capacity, agent Scrocca agreed to purchase 20 kilograms (45 pounds) of heroin from Ochoa at a later date. The price was to be $360,000.00.

Pursuant to Ochoa's instructions, agent Scrocca went to Miami, Florida, and placed a telephone call to Ochoa on December 1, 1970, at the Sandman Motel. After several conversations it was agreed that undercover agent Heyman, also of the BNDD, would meet Ochoa and take him to Howard Johnson's Restaurant on Miami Beach where they would meet with agent Scrocca to finalize the transaction. At the meeting, attended by Scrocca, Heyman, Ochoa, and defendant Claudine Lieros, the parties decided that agent Heyman would accompany Ochoa to the place where the heroin was located so Heyman could test the heroin before making the purchase.

Pursuant to this plan, Heyman, Ochoa and Lieros left the restaurant together and drove to the corner of Southwest 8th Street and 57th Avenue. Once the automobile was parked, Ochoa got out of the vehicle and told Heyman he was leaving to meet his "connection". When Ochoa returned he was in another automobile and accompanied by defendants Rosquette, Noa and Patino. Ochoa and Patino entered Heyman's automobile and, with Lieros, they drove to the Sandman Motel.

After receiving a telephone call from agent Scrocca, Heyman, Ochoa, Patino and Lieros left the motel and drove toward a residence at 1020 Northwest 31st Avenue. The party arrived at the address at approximately 1:00 A.M. on December 2, 1970.

Heyman entered the front of the house through an enclosed porch where he observed defendants Alonso and Pentado standing and watching. As he proceeded toward the living room, Heyman saw Rosquette and Noa and remarked to Patino, "What is this, a convention?" Patino laughed and replied, "No, these are part of the people involved in the deal".

Agent Heyman, Ochoa, Patino, Rosquette and Noa then walked out of the main house and into a separate guest house in back of the residence. In the kitchen of the guest house, agent Heyman began weighing and testing the heroin which was contained in small bags inside a styrofoam tub. While this process was going on Ochoa, Patino, Rosquette and Noa were either in the kitchen helping agent Heyman or sitting in the living room which opened directly into the kitchen.

When agent Heyman finished checking the heroin he returned to the main house and telephoned agent Scrocca to inform him to bring the money to the corner of Northwest 31st Avenue and 11th Street. Heyman then drove his government-owned vehicle into the driveway of the residence where Ochoa and Patino loaded the tub of heroin into the automobile.

At this point agent Heyman, Ochoa and Patino left the residence in another car to meet agent Scrocca and pick up the money. After the $360,000.00 was exchanged Ochoa remained with Scrocca while Heyman returned to the residence with Patino.

The transaction completed, federal agents closed in and began making arrests. Ochoa was arrested as he climbed into agent Scrocca's automobile. Lieros, Pentado and Alonso were arrested at the residence shortly after agent Heyman returned. Noa, Rosquette and Patino left the residence in an automobile and, after driving a few blocks, they were arrested by an officer of the Miami Police Department acting under instructions from federal agents.

Defendants were tried jointly before a jury and convicted on all counts of a five-count indictment. In substance Count I alleged a conspiracy to violate 21 U.S.C. § 174 by an agreement to import and sell heroin; Counts II and III charged defendants with the acts of importing, receiving and selling the heroin in violation of 21 U.S.C. § 174; and Counts IV and V related to selling heroin not in a stamped package and without a written order from Secretary of the Treasury, contrary to the provisions of 26 U.S.C. §§ 4704(a) and 4705(a).

### The Jury Selection Plan

■ Appellants initially contend they were denied trial by a jury of their peers because persons of Spanish ancestry were systematically excluded from the jury list. Appellants immigrated to the United States from Cuba, and if their contention were true, the convictions in this case might have to be reversed. See Whitus v. Georgia, 1967, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599. However, the burden is on appellants to demonstrate the exclusion of any particular group from jury service [1] and an examination of the record reveals no evidence of any exclusionary policy or

practice. To the contrary, the Clerk of the United States District Court for the Southern District of Florida testified that no persons of Spanish ancestry, or any other cognizable groups, were excluded from jury duty. And finally, a jury selection plan substantially similar to the plan attacked here was approved by the court in United States v. Kuhn, 5 Cir. 1971, 441 F.2d 179.

Appellants further contend that the jury selection plan denied them equal protection of the law because citizens between the ages of 21 and 24 are excluded in certain years due to the fact that the jury wheel is refilled at five-year intervals. This same contention was specifically rejected by this court in United States v. Kuhn, supra. And for any matters not strictly within *Kuhn*, there was no showing of a substantial non-compliance in that, considering the population of the District and the size of the master wheel, it was "practicable" (as the Plan phrases it) to have added the names of newly registered voters or that the absence of them could have produced any substantial effect on the fair cross-section concept.

### Search and Seizure

■ Appellants' search and seizure claim concerns the 20 kilograms of heroin which Ochoa and Patino placed in the government-owned vehicle driven by agent Heyman. After the arrests were made, the vehicle was driven to police headquarters and the contraband removed. Appellants contend the government should have secured a search warrant before removing the narcotics from the automobile and that the heroin should have been excluded as evidence.

In support of this argument appellants cite the cases of Preston v. United States, 1964, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, and Dyke v. Taylor Implement Mfg. Co., 1968, 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538, for the proposition that a warrantless search of an

---

1. Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, Whitus v. Georgia, 1967, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599.

automobile is improper once the accused is in custody. However, *Preston* and *Dyke* quite obviously involved automobiles belonging to or possessed by the defendants themselves. In the case at hand the evidence was removed from a vehicle owned by and in the exclusive possession of the government. We have discovered no case which would apply the Fourth Amendment in such an extreme situation and appellants' argument in this regard is totally without merit.

### Admission of Firearms

■ At the trial the court admitted into evidence three firearms: a .22 caliber revolver found in an open dresser drawer in the main house; a .357 magnum revolver which defendant Noa voluntarily handed to police officers when arrested; and a Browning 9-millimeter pistol which was found underneath the front seat of the automobile in which Noa, Rosquette and Patino were arrested. Appellants claim the admission of these weapons was highly prejudicial to their case and not relevant to the issue of guilt or innocence of the crime charged.

We disagree. The trial court has great latitude in passing on the admissibility of evidence, and its determination must be considered an act of discretion not to be disturbed absent a clear showing of abuse. See Wangrow v. United States, 8 Cir. 1968, 399 F.2d 106. Appellants in this case were charged with selling 45 pounds of narcotics worth approximately $360,000.00. It is certainly fair to assume that anyone engaging in a cash transaction of this magnitude would take steps against having the contraband or the purchase money stolen. The weapons had obvious probative.value toward showing that the defendants took the natural precautions that might be expected when goods are sold for a large amount of cash. See United States v. Ravich, 2 Cir. 1970, 421 F.2d 1196.

### The Instruction on Conspiracy

■ In its instruction to the jury on Count I of the indictment, involving statutory conspiracy under 21 U.S.C. § 174, the district court failed to instruct the jury that knowledge of illegal importation of heroin was an essential element of the crime. Appellants contend this omission constitutes reversible error, citing the Second Circuit's decision in United States v. Massiah, 2 Cir. 1962, 307 F.2d 62, rev'd. on other grounds, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). This contention, however, ignores the jury's verdict on the other substantive counts in which knowledge of illegal importation was clearly charged. Since these other counts involved the same facts as the conspiracy count a verdict of guilty on all counts necessarily meant that the jury found that appellants knew the narcotics were illegally imported. Thus, any error in the conspiracy instruction was cured by the verdict of guilty on the other substantive counts. Indeed, this is the position adopted by the Second Circuit in cases decided after United States v. Massiah, supra. United States v. Baratta, 2 Cir. 1968, 397 F.2d 215; United States v. Chow, 2 Cir. 1968, 398 F.2d 596.

### Failure to Grant Motion for Severance—Alonso and Pentado

■ Although he never testified, appellant Ochoa entered a plea of entrapment during the trial. Relying on the case of Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, appellants Alonso and Pentado contend the district court erroneously refused to grant their motion for severance. In *Bruton,* however, the Supreme Court was concerned with a confession from a co-defendant which inculpated Bruton. The confession was admitted into evidence at a joint trial and the co-defendant did not take the witness stand. The court held that Bruton's Sixth Amendment right of cross-examination was violated by such a procedure despite the jury instruction to disregard the confession as to Bruton.

In the case at hand there is an absence of any inculpatory testimony admitted into evidence in violation of Alon-

so's and Pentado's right to cross-examine witnesses against them. For that reason United States v. Bruton, supra, is inapplicable to the facts of this case.

The district court was well within its discretion in refusing to grant the motion for severance. Tillman v. United States, 5 Cir. 1969, 406 F.2d 930; Rule 14, Federal Rules of Criminal Procedure; Schneble v. Florida, 1972, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340; United States v. Russo, 5 Cir. 1972, 455 F.2d 1225 [1972].

### Probable Cause for the Arrest of Rosquette, Noa and Patino

After the sale of the narcotics Rosquette, Noa and Patino left the residence in an automobile. As they drove away federal agents followed them in an unmarked vehicle. The agents then observed officer Mell of the Miami Police Department parked on the side of the street in his official patrol car. The agents pulled up beside Mell's automobile, identified themselves as federal officers, and told Mell to stop the car with the taillight out—meaning the vehicle driven by the three appellants.

Mell drove a few blocks and then stopped appellants' automobile. Noa, the driver of the automobile, got out of the vehicle and voluntarily informed Mell that he was armed. Mell took the pistol from Noa. Approximately three minutes later federal agents arrived on the scene and arrested appellants and took them into custody.

Appellants contend officer Mell lacked probable cause to make their arrest. We cannot agree. Probable cause may exist even though the arresting officer has observed no unlawful activity and is unaware of the identity of the accused. United States v. Sanchez, 5 Cir. 1969, 412 F.2d 1177. Turning to the facts of this case we note that Mell was directed by his superiors to station himself in a certain area of Miami. While in that area Mell was personally contacted by agents of the BNDD and informed that federal agents were conducting a narcotics investigation and that his assistance might be needed. Ten minutes later the same agents told Mell to stop the car with taillight out.

Under the circumstances we hold that the federal BNDD officers using reasonable caution were justified in believing that a felony had been committed and, hence, the requirement of probable cause is met. Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441; Johnson v. Middlebrooks, 5 Cir., 1967, 383 F.2d 386. Cf. Whiteley v. Warden, 1971, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306.

Appellants also claim there was an unlawful working arrangement between federal and state officers. Federal agents ordered Mell to make the arrest, according to appellants, because the agents themselves lacked probable cause. As evidence of this proposition, appellants stress the fact the federal agents were directly behind appellants' automobile and could have easily made the arrest without Mell's assistance. However, the more logical explanation of the federal agents' failure to initiate the arrest was the fact that the agents were traveling in an unmarked vehicle while Mell commanded a marked automobile complete with siren and revolving light. Rather than evincing a lack of probable cause, the failure of federal agents to stop appellants' vehicle simply shows the natural desire of the agents to make an arrest and incur the least amount of danger to themselves and the general public.

### Prejudicial Statement by Government Witness—Rosquette and Noa

On direct examination federal agent Heyman identified Rosquette and Noa as being present in an automobile at a nighttime meeting on the corner of 8th Street and 57th Avenue. When cross-examined by Mr. Kleinfield, attorney for Rosquette and Noa, Heyman stated that he recognized Rosquette from pictures "because he is a documented trafficker in our files". Kleinfield im-

mediately moved for a mistrial, and the court denied the motion.

On appeal Rosquette and Noa claim their right to a fair trial was prejudiced by this statement and that the district court erred in refusing to grant a mistrial. This argument is without merit. A review of the record reveals that attorney Kleinfield was attempting to discredit Heyman's testimony by a series of questions designed to show that Heyman may have been mistaken in his identification of appellants. Having adopted this strategy, appellants took the risk that Heyman would explain why he was so certain he recognized Rosquette. Appellants could have requested the court to instruct the jury to disregard the prejudicial statement but they declined to do so. The error complained of here was invited by appellants' own counsel and a reversal is not required. United States v. Davis, 5 Cir. 1971, 443 F.2d 560; and see Wright, Federal Practice and Procedure: Criminal, 362, § 854.

■■■ As to Rosquette's claim that the evidence against him was insufficient to sustain his conviction, we have carefully reviewed the entire record and we find the evidence of his participation in the offense overwhelming.

### Sufficiency of the Evidence— Alonso and Pentado

■■■ The government's case against Alonso and Pentado may be summarized as follows: Agent Heyman testified that he first saw Alonso and Pentado along with several of the other defendants at a meeting at the corner of Southwest 8th Street and Southwest 57th Avenue. Nothing said at this meeting was heard by either Alonso or Pentado since they remained in a separate automobile. As he arrived to pick up the heroin at 1:00 A.M. on December 2, 1970, agent Heyman again observed Alonso and Pentado inside an enclosed porch of the main house. When asked to describe what the two defendants were doing, Heyman replied that they appeared to be "watching".

After Heyman had proceeded from the porch to the living room, where several other defendants were standing, Heyman commented on the large number of people present at the residence. Defendant Patino replied that "[T]hese are part of the people involved in the deal". There was no evidence that Alonso and Pentado were within earshot of Patino when he made this statement.

After all the arrests were made, government investigators found Alonso's fingerprint on a paper bag which had been placed on top of the heroin within the styrofoam container.

Alonso and Pentado contend that the above evidence was insufficient to support a verdict of guilty against them, and that their motion for a directed verdict of acquittal should have been granted. We hold that the district court properly denied the motion.

In reviewing the sufficiency of the evidence in criminal cases based on circumstantial evidence, this court is bound by the principle that a conviction must be upheld where "reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence". United States v. Warner, 5 Cir. 1971, 441 F.2d 821, 825. The evidence must of course be considered in the light most favorable to the government's case. United States v. Glasser, 1944, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

Applying these standards to the evidence against Alonso and Pentado, we begin with the fact that all the defendants were charged with selling heroin worth approximately $360,000.00. For such an expensive illegal operation a seller might reasonably be expected to take precautions against detection by the authorities or theft by others engaged in the narcotics business. Alonso and Pentado were indisputably on the front porch of the main house "watching" when agent Heyman arrived. Since the residence and the surrounding grounds were not public property, it is significant that no innocent explanation appears from the record as to exactly why

these two defendants were present at the site of a heroin sale at 1:00 o'clock in the morning. Compare Vick v. United States, 5 Cir. 1954, 216 F.2d 228, with Surrett v. United States, 5 Cir. 1970, 421 F.2d 403. At this point in the testimony, the jury could have properly inferred, to the exclusion of every other reasonable hypothesis, that Alonso and Pentado were involved in the heroin transaction and that their purpose was to warn the others of possible danger from intruders. There is simply no other rational explanation for their presence at that time at that place, in view of all the circumstances of this case. It must be recalled that the other participants were taking extraordinary precautions to (i) prevent an underworld "double-cross" and (ii) avoid detection by the authorities. The whole bifurcated procedure for transferring the heroin at one location and the money at a separate location, blocking the heroin-loaded car in the driveway with a truck, carrying an arsenal of weapons, and other such abundantly cautious arrangements, actions and details lead inexorably to the conclusion that the participants were anxious to prevent some third party from relieving them of the fruits of their illegal enterprise. Having taken all of those precautions to prevent a "double-cross," it is absolutely incredible to hypothesize that the persons on the front porch "watching" were *not* lookouts posted to warn the others in the event that such a "double-cross" developed.

Moreover, there was an abundance of intrigue aimed at avoiding detection by the authorities. The interstate character of the transaction, the meeting on corners, the use of the back yard guest house *instead of the main house to* inspect the heroin, the relaying of messages through an intermediary at a motel testify convincingly of the extreme caution exercised in this regard. Not only is a lookout required to effectuate this goal, but it stretches credulity to conclude that these defendants would risk the exposure they had so carefully avoided by allowing an innocent by-passer—even a friend—to stumble upon their surreptitious activities by remaining during the crucial hours of their $360,000 transaction. It is plainly unreasonable to infer that anyone else other than a participant would be allowed on the premises.

Under these circumstances, we hold that there is substantial evidence in the record to support the conviction of Alonso and Pentado.

Having considered all the assignments of error, the conviction of each defendant on all counts is hereby affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.