**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Russell GREENFIELD, M.D.,
Defendant-Appellant.**

**No. 76–2604.**

United States Court of Appeals,
Fifth Circuit.

June 16, 1977.

James Jerry Wood, Montgomery, Ala., for defendant-appellant.

Ira DeMent, U. S. Atty., Milton L. Moss, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before GOLDBERG and HILL, Circuit Judges, and KERR,* District Judge.

HILL, Circuit Judge:

The defendant, Dr. William Russell Greenfield, was indicted in a ten count indictment returned by a federal grand jury in the Middle District of Alabama on April 8, 1976. The ten count indictment charged in each count a violation of 21 U.S.C.A. § 841(a)(1).[1] After a two-day trial the jury returned guilty verdicts on three counts. The defendant was sentenced to the custo-

---

* Senior District Judge of the District of Wyoming, sitting by designation.

1. 21 U.S.C.A. § 841(a)(1) provides:
   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

dy of the Attorney General for a period of two years and to a two year special parole term.

The first witness for the government was Terry Conner, an undercover investigator for the Alabama Division Investigative Unit. Ms. Conner first went to Dr. Greenfield's office on October 16, 1975, using the name "Linda Thornton." Ms. Conner told Dr. Greenfield that she needed something to help her stay awake at night while she worked and that she had to baby-sit in the daytime for her sister's children. She obtained a prescription for thirty-six five milligram Dexedrine after her temperature, blood pressure, pulse and weight had been checked. She was asked for a urine sample but could not produce one. Dr. Greenfield told Ms. Conner that she should not abuse the pills and should not give them away or sell them to her friends. Ms. Conner was charged $10.00 for this initial visit.

On October 30, 1975, after her weight and blood pressure were checked, Ms. Conner received a prescription for twenty-four Dexedrine. On November 13, 1975, Ms. Conner told Dr. Greenfield that she did not like the last prescription that he had written for her. After checking her weight and blood pressure, Dr. Greenfield prescribed fifty Dexamyl tablets.

One week later, on November 20, 1975, Ms. Conner returned to Dr. Greenfield's office and told him that the last prescription had made her sick. Dr. Greenfield told her that he could not write her another prescription so soon and asked Ms. Conner for the name of a girl friend. She suggested the name "Kathy Kane" and Dr. Greenfield wrote a prescription for thirty-six Dexedrine in the name of "Kathy King."

On December 3, 1975, Ms. Conner received a prescription for fifty Dexedrine with the admonition that she should learn

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

to count. On January 6, 1976, after her blood pressure was checked, Ms. Conner received another prescription for fifty Dexedrine, although she did not personally see Dr. Greenfield.

On January 15, 1976, Ms. Conner returned to Dr. Greenfield and stated that she needed a refill for her last prescription. Dr. Greenfield told her that she "was taking too many pills" but that he would prescribe Ionamin because it was a schedule IV drug and "he couldn't get in trouble for them." [Tr. at 41]. She received a prescription for twenty-four Ionamin which Dr. Greenfield told her she could share with her friends.

One week later Ms. Conner told Dr. Greenfield that her prescription was gone. Dr. Greenfield stated that he could not give her another prescription. When Ms. Conner stated that her sister "Terry Carter" had been taking the pills, Dr. Greenfield wrote a prescription in the name of "Terry Carter" for thirty-six Ionamin.

On February 11, 1976, Dr. Greenfield prescribed thirty-six Ionamin for Ms. Conner without seeing her. On March 11, 1976, Ms. Conner received a prescription for one hundred Dexedrine. Finally, on March 25, 1976, Ms. Conner obtained a prescription for thirty Ionamin. The government then introduced tapes of conversations recorded on five of Ms. Conner's visits to Dr. Greenfield's office.

The government last called Dr. Jesse Samuel Griffith, a flight surgeon stationed at Fort Rucker, Alabama. He testified to the importance of thorough medical histories when prescribing drugs and gave his opinion that the prescriptions of drugs upon the facts stated by Ms. Conner would not be proper. Dr. Griffith also testified that it would not be proper medical practice to write prescriptions in the names of fictitious persons.

The defense presented fourteen witnesses, including six physicians. Each physician testified that Dr. Greenfield's reputation as a doctor was excellent and that the prescriptions to Ms. Conner were appropriate under the circumstances. However, most of the physicians indicated that it was improper to write a prescription in a name other than the patient's. The defense then called seven witnesses who testified to Dr. Greenfield's good reputation in the community. Dr. Greenfield was called as the last defense witness. He testified that his treatment of Ms. Conner was typical of the way that he practiced and that he felt that there was a legitimate medical reason for prescribing the drugs for her. The jury convicted the defendant for the prescriptions written on January 15, January 22, and February 11, 1976. While we are convinced that the evidence is sufficient to sustain the jury's verdict, we reverse on the issue of entrapment.

## ENTRAPMENT

The defendant asserts that the evidence in this case established entrapment as a matter of law, or, at the very least, entitled him to have the issue of entrapment submitted to the jury. The defense proffered four charges on entrapment. The trial court refused to charge on entrapment on the ground that the "entrapment defense is not available until the defendant admits the commission of the crime." [Tr. at 333]. We agree with the defendant that he was entitled to raise the defense of entrapment under the peculiar circumstances of this case. Of course, whether the defendant is entitled to have the issue of entrapment submitted to the jury will depend upon the evidence adduced at his retrial.

The government correctly notes the existence of a veritable legion of opinion in this circuit forbidding a defendant from pleading entrapment and at the same time denying the very acts upon which the prosecution is predicated. *See e. g., United States v. Morrow*, 537 F.2d 120, 138–139 (5th Cir. 1976); *United States v. Ramirez*, 533 F.2d 138 (5th Cir.), *cert. denied*, 429 U.S. 884, 97 S.Ct. 235, 50 L.Ed.2d 165 (1976); *United States v. O'Leary*, 529 F.2d 1202 (5th Cir. 1976); *United States v. Newcomb*, 488 F.2d 190 (5th Cir.), *cert. denied*, 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234

(1974); *United States v. Russo*, 455 F.2d 1225 (5th Cir.), *cert. denied*, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972). The rationale for the rule appears to be that to deny the very acts upon which the prosecution is predicated and at the same time to plead the defense of entrapment, which assumes that the acts charged were committed, is too inconsistent. *United States v. Williamson*, 482 F.2d 508, 515 (5th Cir. 1973); *Government of the Canal Zone v. Risbrook*, 454 F.2d 725 (5th Cir. 1972); *United States v. Groessel*, 440 F.2d 602 (5th Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971); *McCarty v. United States*, 379 F.2d 285 (5th Cir. 1967). This position has recently come under strong attack as in conflict with prevailing Supreme Court authority and detached from its theoretical moorings. *United States v. Demma*, 523 F.2d 981 (9th Cir. 1975) (*en banc*).

■ The rule in this circuit, however, is not unbending. Thus, if the government's own case in chief injects substantial evidence of entrapment into the case, the defendant is entitled to raise the defense of entrapment. *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965).

> We do not think it is impermissibly inconsistent for a defendant to deny the acts charged, yet urge the court on motion for acquittal that the government's own evidence establishes entrapment as a matter of law. Similarly, the defendant is entitled to have a charge adjusted to the evidence, and if the government injects evidence of entrapment into the case, the defendant is entitled to have the jury instructed that if they find he committed the acts charged, they must further consider whether he was entrapped into committing them. We feel that the ultimate goal of the criminal trial, the ascertainment of truth, permits no other course. A criminal defendant should not forfeit what may be a valid defense, nor should the court ignore what may be improper conduct by law enforcement officers, merely because the defendant neglected to put the government to its proof.
>
> *Id.* at 143–144. (citations omitted).

■ A second exception to the rule is that the defense of entrapment is available where a defendant denies that he was a party to or knew of a conspiracy with which he is charged, but admits commission of one of the alleged overt acts. *Henderson v. United States*, 237 F.2d 169 (5th Cir. 1956). Recognizing that the common goal of all trials of issues of fact is to arrive at the truth, the court in *Henderson* concluded "that inconsistent positions should be permitted or not permitted according to whether they might help or hinder a search for the truth. Perhaps that may depend upon the degree of inconsistency." *Id.* at 172. The analysis of the court in *Henderson* is instructive:

> If the evidence fails to prove by the required standard that the defendant committed the act charged or had the requisite criminal intent, then, of course, the defense of entrapment is unnecessary. Usually, however, that cannot be foretold when the proof is being offered in advance of the jury's verdict. Then according to the circumstances and the nature of the case, proof of entrapment may or may not be so contrary or repugnant to proof that the defendant is otherwise not guilty, or rather to a lack of the required proof that the defendant is otherwise guilty, that the proof of the one necessarily disproves the other. . . . So here, it seems to us that the defendant could admit operating the illicit still, deny being a party to the conspiracy charged, and still defend on the ground that such overt acts as he did commit were done as a result of entrapment; he could say, "I did not go so far as to become a party to the conspiracy, but to the extent that I did travel down the road to crime, I was entrapped." The two defenses do not seem to us so repugnant that proof of the one necessarily disproves the other. *Id.* at 172–173 (citations omitted).

■ So too, in the instant case we are persuaded that the defendant should be permitted to deny commission of any crime and also raise the defense of entrapment. The defendant in this case readily admitted

to the *physical acts* alleged to constitute the offense. The sole contested issue at trial was the intent with which the acts were committed. The defendant strenuously asserted that the prescriptions to Ms. Conner were for a legitimate medical purpose and within the course of his professional practice. Necessarily, the issue of criminal intent or guilty knowledge was a factual issue for the jury to resolve on the basis of circumstantial evidence under the totality of the circumstances. It was a subjective determination.

We do not believe that it is impermissibly inconsistent under these circumstances for a defendant also to argue that to the extent that the jury may find culpability on his part, he was entrapped. The defendant may say, "I did not go so far as to prescribe drugs without a legitimate medical purpose, but to the extent that you find that I did, I was entrapped." For instance, in this case the defendant was charged with having dispensed drugs illegally on ten different dates. The jury convicted him for the last three prescriptions.[2] The jury evidently concluded that while the early prescriptions for Ms. Conner were legitimate, the defendant knew as time passed that her numerous visits for drugs were not proper. We are persuaded that under these circumstances it is permissible for the defendant to argue to the jury that he was entrapped. That is, he may argue that he did not knowingly dispense the drugs without a legitimate medical purpose or, alternatively, he may argue that to the extent that he may have prescribed without a legitimate medical purpose, he was not predisposed to do so.

■ In this regard, a distinction must be made between the defense of entrapment and the defense that the drugs were prescribed for a legitimate medical purpose. Thus, in the latter situation the defense may contend, as in this case, that the government agent convinced the physician that a legitimate medical problem existed for which drugs should be prescribed. It matters not that the government agent in fact lied and deceived the doctor. In a situation such as this in which subjective criterion and the information conveyed by the patient determine the proper remedy, there is no entrapment. If the government agent through lies and deception convinces a physician that a legitimate medical need exists for the drugs, the physician is simply not guilty of a crime.

■ On the other hand, if a government agent never purports actually to have a medical need for drugs, but, instead, merely convinces an unwilling physician to prescribe drugs, the defense of entrapment may be tendered. In the instant case the two converge. The defendant argues, on the one hand, that he was convinced by Ms. Conner that she had a legitimate medical need for the drugs that he prescribed. Evidently, the jury was convinced of this fact in that they acquitted the defendant for his earliest prescriptions of drugs to Ms. Conner. However, the jury found that at some point the legitimate medical purpose which originally existed for the prescriptions evaporated. The jury found that at some point the defendant knew that the prescriptions were not proper. While the defendant asserts that the prescriptions continued to be proper, we think that he may also assert that to the extent that they became improper he was induced to commit a crime by a government agent. That is, he may contend that, while he was not predisposed to illegally prescribe drugs, by the use of the doctor-patient relationship he was persuaded by an agent of the government, contrary to his innocent nature, to dispense the drugs illegally.

We do not decide that the defendant is entitled to an entrapment defense upon retrial. We simply hold that the entrapment defense is not so inconsistent with the defense of lack of intent under the circumstances of this case as to preclude the alternative defenses. The decision as to whether the defendant is entitled to have the defense of entrapment go to the jury on retrial will necessarily depend upon an eval-

2. While the evidence at trial revealed that Ms. Conner saw Dr. Greenfield on March 11 and 25, 1976, the two March visits were dismissed from the indictment.

uation of the evidence presented. *See United States v. Groessel, supra* at 605.

## OTHER PATIENTS

Because this case must be remanded for a new trial, we will also discuss issues likely to recur. As stated, Dr. Greenfield took the stand in his own defense. On direct examination by his attorney Dr. Greenfield admitted that he had been visited on three occasions by an investigator of the Alabama Medical Board of Censors and that the investigator felt that Dr. Greenfield was overprescribing amphetamines as compared to other doctors in the State. This admission was evidently designed to explain why Dr. Greenfield had written a prescription for Ms. Conner in the name of "Kathy King" as "I would dislike for him [the investigator] to find that I had written two prescriptions for the same person in seven days' time for a similar drug." [Tr. at 272]. Dr. Greenfield went on to testify that he made wide use of amphetamines in his practice for various medical problems and that he considered his prescriptions to Ms. Conner to be for a legitimate medical purpose.

On cross-examination government counsel made inquiry as to five of Dr. Greenfield's "patients." In each instance Dr. Greenfield admitted that he had prescribed drugs for them. Dr. Greenfield was asked if he knew that two of his patients were drug abusers. Dr. Greenfield stated that he had later learned that one was a drug abuser, but he denied knowing that the other patient abused drugs. Dr. Greenfield was then asked about a third patient at which point defense counsel objected to "going through his complete repertoire of patients. We can discuss each and every patient. Is he alleging some misconduct relative to this?" [Tr. at 285]. The trial court suggested that government counsel was laying a predicate to which government counsel agreed and overruled the objection. Thereafter, cross-examination revealed that at the request of a local pharmacist Dr. Greenfield had for four years been prescribing morphine for two elderly ladies whom he had never seen.

While the testimony regarding some of Dr. Greenfield's other patients was admitted on the theory that the government was laying a predicate, there was no follow-up. The government called a narcotics officer in rebuttal and the following exchange occurred:

[by government counsel, Moss]

Q. Let me ask you, sir, have you ever heard—or do you know an individual named Danny Ivey?

A. I do.

Q. Is Mr. Ivey known to you in your official capacity as a police officer at Enterprise as an abuser of controlled drugs?

MR. WOOD:—[Defense counsel] Object.

A. Yes, sir· he is.

MR. WOOD: It is not rebuttal, not proper rebuttal.

THE COURT: I sustain it. Sustain the objection. The evidence is excluded.

MR. MOSS: No further questions at this time, Your Honor.

[Tr. at 306].

Government counsel returned to this subject in his argument to the jury:

When he [Dr. Greenfield] got on the stand, and he testified that he had prescribed for other people, Mrs. Coe and Mrs. Cherry, who he has never seen, does not know until this day whether they exist; he had been writing them prescriptions for morphine since 1972. For Mr. Ivey and Miss Graham, he testified—

MR. WOOD: Objection.

MR. VINES:—he testified that—

THE COURT: I sustain it; objection is sustained; argument is excluded.

[Tr. at 331].

The defense contends that this evidence concerning other patients and their characterization as "drug abusers" and "addicts" was inadmissible and highly prejudicial. The defense charges that Dr. Greenfield was tried on the basis of innuendos and suggestions that he was guilty of other offenses or misconduct. The government asserts that these questions were proper to show knowledge and intent. Thus, Dr.

Greenfield did not deny that he wrote the prescriptions for Ms. Conner. The critical issue in the case was whether the prescriptions had been written for a legitimate medical purpose and Dr. Greenfield's knowledge and intent were of paramount importance.

Generally, evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that on this particular occasion he acted in conformity therewith. Fed.R.Evid. 404(b). The inference that the accused is a "bad man" and thus, probably committed the offense with which he is charged is legally impermissible. The objection is not that the evidence is not relevant for this purpose but that its value is overbalanced by the danger of undue prejudice which the evidence might arouse. *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); McCormick on Evidence § 191 (2d Ed. 1972). "The over-riding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." *Michelson v. United States, supra* at 476, 69 S.Ct. at 218 (footnote omitted).

As is the case with most general rules, the litigated cases are more concerned with the recognized exceptions and this case is no different. We should constantly keep in mind, however, that the general rule excluding evidence of other crimes or misconduct is a wise and just rule and the exceptions "carved out to serve a limited prosecutorial and judicial purpose, should not be permitted to swallow the rule." *United States v. Miller,* 500 F.2d 751, 762 (5th Cir. 1974), *rev'd on other grounds,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (footnote omitted). One recognized exception to the rule is that evidence of other crimes or misconduct is admissible to prove intent or guilty knowledge. Fed.R.Evid. 404(b); *United States v. Urdiales,* 523 F.2d 1245, 1246–47 (5th Cir. 1975), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976) and cases cited therein. In the case *sub judice* we are concerned with evidence of other acts of the accused rather than evidence of other crimes. Thus, the prerequisites for admission are less stringent.[3]

The test of admission for evidence of prior similar acts is "the traditional balancing of probative value against prejudicial effect." *United States v. Simmons,* 503 F.2d 831, 834 (5th Cir. 1974); *see also United States v. Crockett,* 514 F.2d 64, 71–73 (5th Cir. 1975); *United States v. Bowdach,* 501 F.2d 220, 227 (5th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975); *United States v. Scanland,* 495 F.2d 1104, 1108 n. 12 (5th Cir. 1974). The problem that the government faces in this case is that the evidence as to the relationship of Dr. Greenfield with five of his other patients was not shown to constitute similar acts and were of little probative value on the issue of intent.

With regard to three of the patients the government simply *implied* that they were "drug abusers" and had the defendant admit that he *subsequently learned* that one of these patients was an abuser of drugs. The defendant also admitted that he knew that two patients for whom he prescribed morphine had been addicted since 1955. The legally permissible inference which the government might hope that the jury would draw from this evidence is that Dr. Greenfield knew from these prior instances of abuse and addiction that his prescriptions for Ms. Conner were not legitimate. The logical inferential chain, however, is weak

---

**3.** When the acts sought to be admitted constitute a prior criminal offense the inherent danger of prejudicing the jury against the defendant is so great that unless the evidence of the other similar crime is reasonably necessary to the government's case, and is plain, clear and conclusive, its probative value will not be held to outweigh its possibility or [sic] prejudice. Thus we have held evidence of a prior offense admissible to show intent or guilty knowledge only if the prior offense included the essential physical elements of the offense charged, and these physical elements, but not necessarily the mental element of the offense, are clearly shown by competent evidence. *United States v. Simmons,* 503 F.2d 831, 834–835 (5th Cir. 1974) (citations omitted); *see also United States v. Urdiales, supra.*

at best. That is to say the probative value of the evidence, i. e., its tendency to persuade, is minimal. The weakness lies in the circumstance that the evidence shows no contemporaneous knowledge or intent as regards Dr. Greenfield's prescription of drugs to other patients.

Nor is the evidence concerning Dr. Greenfield's other patients similar in nature. The similarity contemplated is a matter of relevancy and is "judged by the degree in which the prior act approaches near identity with the elements of the offense charge. There is no necessity for synonymity but there must be *substantial* relevancy for purposes other than to show the probability that the person committed the offense being tried because he is a man of criminal character." *United States v. Kasouris,* 474 F.2d 689, 692 (5th Cir. 1973); *see also United States v. Bryant,* 490 F.2d 1372, 1377 (5th Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 57, 42 L.Ed.2d 58 (1974). Thus, while the testimony was that Dr. Greenfield *knew* that one of his patients *subsequently* became a drug abuser and that two other patients were *allegedly* drug abusers, there is no evidence whatsoever that Dr. Greenfield *knowingly* prescribed drugs for them without a legitimate medical purpose or circumstances from which such might be inferred. *See United States v. Broadway,* 477 F.2d 991, 995 (5th Cir. 1973). Intent was the issue in this case. While the prescription of morphine to known addicts is somewhat similar, the circumstances were totally dissimilar. In sum, the government introduced *slightly similar* conduct of highly *questionable* probative value.

On this appeal we need not weigh the value of this evidence against the potential prejudice to the accused. While the defense asserts that objection was raised to this line of questioning, the record reveals that a vague objection was entered as to "going through his complete repertoire of patients." This was insufficient. The trial court must be apprised of the basis for objection with sufficient particularity to allow an informed decision to be made on the legal issue involved. *United States v Garcia,* 531 F.2d 1303 (5th Cir.), *cert. denied,* 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976). When the trial court admitted the evidence on a predicate theory, the defense never moved to strike the testimony once the government failed to follow-up on the line of inquiry. A trial judge is entitled to assume that counsel for the litigants will press upon him matters which they consider improper or prejudicial to their client. Normally, the failure to do so will end the matter. We merely commend this approach to the trial court should the issue arise upon retrial.

REVERSED and REMANDED.