Charles T. HENDERSON, Jr., George
Truitt Robbins and John B. Dees,
Appellants,

v.

UNITED STATES of America,
Appellee.

No. 15726.

United States Court of Appeals
Fifth Circuit.

Sept. 26, 1956.

Rehearing Denied Oct. 23, 1956.

S. L. Scruggs, Parks M. Carmichael, Joseph A. McGowan, Gainesville, Fla., Charles A. Savage, James J. Caruso, Ocala, Fla., Zach H. Douglas, Jacksonville, Fla., W. N. Avera, Scruggs, Carmichael, Avera & McGowan, Gainesville, Fla., for appellants.

Hayford O. Enwall, Asst. U. S. Atty., Gainesville, Fla., Harrold Carswell, U. S. Atty., Tallahassee, Fla., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

Under 18 U.S.C. § 371, the three appellants were convicted of a conspiracy to violate certain sections of the Internal Revenue Code which proscribe the various activities connected with the distilling of non-taxpaid, or moonshine, whiskey. During the period of the alleged conspiracy, that is from August 15, 1954 to February 8, 1955, the appellant George Truitt Robbins was Sheriff of Levy County, Florida; the appellant Dees was a resident of Jacksonville, Florida, charged with having furnished financial backing for the illicit operations; and the appellant Henderson participated in the actual operation of the still.

Three other original defendants were not convicted. John C. Partin, an alleged go-between for the bribery of the sheriff was discharged on motion for judgment of acquittal. The jury returned verdicts of not guilty as to Luther M. White, who admitted furnishing financial aid to the operations but claimed entrapment, and as to Ernest C. Blair, a Supervisor for the Beverage Department of the State of Florida, charged with having accepted bribe money.

No brief has been filed, nor argument made, on behalf of the appellant Dees, but the Government does not move for dismissal of his appeal under Rule 22 of this Court, and we therefore consider his appeal on its merits along with each of the other two appeals.

Claude W. Wood, the principal or star witness for the Government, had been a policeman of Ocala, Marion County, Florida, and while so serving he was also a deputy sheriff of the County. He had, by request, resigned from the police force, after which he moved to Gainesville, Florida, where he worked as a roofer for several months and drove a taxicab for about a month. While Wood was in Gainesville, another Marion County deputy sheriff solicited his aid in the detection of liquor law violators in Marion County, which adjoins Levy County.

Thereafter, in August, 1954, Wood made several trips to see Henderson at Henderson's home some 16 miles east of Ocala, and talked to him about going into the moonshine whiskey business. On the first two occasions, at least, Henderson refused, but he finally succumbed, and he and Wood agreed to go into the moonshine business. Wood then returned to Marion County where he and his wife stayed at the home of his father and mother.

In early September, 1954, the Sheriff of Marion County and some of his deputies carried Wood to a series of conferences with C. M. Starry, District Supervisor of the Florida State Beverage Department, who had the responsibility of supervising the enforcement of the state beverage laws in ten counties, including the counties of Marion and Levy. Ernest C. Blair, a defendant in the case discharged by verdict of not guilty, was one of seven supervisors who worked under Starry. As a result of these conferences with Starry, Wood was, on September 9, 1954, secretly appointed a Special Inves-

tigator for the Office of the Attorney General of Florida.

Wood testified that Henderson knew of a still pot and condenser in Putnam County which he said belonged to J. B. Dees, one of the appellants; that, on October 6th, Henderson accompanied Wood to Jacksonville to see Dees; that there they arranged for the use of the still pot and condenser and Dees advanced them $107.00 with which to set up some fermenter barrels for him at the still site; that it was at Dees' directions that the place of operations was changed from Marion to Levy County.

On October 12, Henderson and Wood made their "first run", producing seven five-gallon jugs of whiskey. Successive runs were made on October 16, 21, 23, 26 and 27th, November 9 and thereafter. The site of the still was moved twice.

The Federal Government did not enter into the investigation until December 27, when Criminal Investigator William D. Behan of the Alcohol and Tobacco Tax Unit of the Treasury Department, stationed at Miami, was assigned by the Investigator in Charge to assist Wood in the investigation. Under the alias of Forest Crooke, Behan thereafter participated in the illicit operations. Behan was able to give positive testimony connecting Henderson with the operation of the still, Dees with its financing, and

Robbins with being bribed to furnish protection in his capacity as Sheriff.

No evidence was offered on behalf of Dees. Henderson admitted his participation in the operation of the illicit distillery, but denied that he had contacted Dees or was otherwise a party to the conspiracy. His principal defense was that he had been entrapped by Wood.

Without dispute, Wood did induce Henderson to enter into the operation of the illicit still, and Henderson was at first reluctant to join. It further appears that, though Wood had resigned as a police officer of the City of Ocala, he had retained his card as deputy sheriff and was qualified and acting as such, and made use of that office in persuading Henderson to enter into the moonshine whiskey business. Nevertheless, the district court declined to charge on entrapment as to Henderson, apparently upon the theory that Henderson denied that he was a party to the conspiracy, and thereby precluded himself from relying on entrapment.[1]

The reasoning of the district court was, of course, correct to the extent that the fact that Henderson had committed illegal acts which furthered the object of the conspiracy did not constitute him a conspirator unless he did so with some knowledge of the conspiracy,[2] and, hence, that Henderson, deny-

---

[1] "The Court: I am going to deny your requested charge on entrapment because entrapment insofar as Henderson is concerned I do not think it is applicable to him. I am going to tell the jury insofar as he is concerned he denied every overt act with which he is charged in this indictment other than those that connect him with the operation of the stills."

The district court charged the jury as follows:

"An overt act alone, without an unlawful agreement or understanding, is not a criminal conspiracy. In other words, Mr. Henderson has here based his defense entirely on the fact that while he committed these overt acts of assisting in the setting up of a still and in the manufacture of moonshine he knew nothing about the conspiracy, he didn't see Partin, he didn't see the Sheriff, he didn't see Blair, he

didn't do any of those other things that he is charged with doing in the indictment, and which the Government witnesses testified that he did do. Now, don't you see when you come to Henderson how it narrows down to what you have got to consider in this case to determine his guilt or innocence. If you believe the Government witnesses insofar as his activities in the other respects and disregard his testimony, then he was a party to the conspiracy. If you have a reasonable doubt as to whether or not he participated in any other acts other than the mere operation of the still and the manufacture of moonshine whiskey, then he wouldn't be guilty of this conspiracy."

[2] United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128; cf. Hunnicutt v. United States, 5 Cir., 149 F.2d 888, 889, 890.

ing that he was a party to or knew of the conspiracy, could not with entire consistency claim that he was entrapped into committing that offense. The district court may well have relied upon the language of this Court in Hamilton v. United States, 5 Cir., 221 F.2d 611, 614:

> "Entrapment is a valid, positive defense, in certain circumstances, the invocation of which necessarily assumes that the act charged was committed. 22 C.J.S., Criminal Law, § 45."

The actual holding in that case was that the appellant was entitled to have the issue of entrapment properly submitted to the jury. Other courts have, however, definitely held that a defendant's denial of one specific act charged, such as a sale of whiskey,[3] or a sale or possession of narcotics,[4] would necessarily preclude him from relying on the defense of entrapment.

■ Rule 8(e) (2) of the Federal Rules of *Civil* Procedure, 28 U.S.C.A. provides that a party may plead as many separate defenses as he has "regardless of consistency". No similar provision occurs in the Federal Rules of Criminal Procedure, and, indeed, no such provision would be appropriate in view of the fact that all possible defenses not raised by appropriate motion are embraced within the plea of not guilty. Rule 12 (a), Federal Rules of Criminal Procedure, 18 U.S.C.A. Indeed, long prior to the adoption of those rules, it had been settled that the defense of entrapment was raised by the plea of not guilty. Sorrells v. United States, 287 U.S. 435, 452, 53 S.Ct. 210, 77 L.Ed. 413. The fact, however, that such a plea raised both issues, that is, that Henderson did not enter into the conspiracy charged and that he was entrapped so to do, does not necessarily mean that he can rely upon both defenses, but simply changes the form of the question by transferring it

from the pleadings to the proof. Substantially, the question remains the same.

Corpus Juris states the rule in criminal cases as follows:

> "While there is authority to the contrary, it is generally held that inconsistent defenses may be interposed in a criminal case. Accordingly, the fact that one defense is on the theory that accused did not commit the offense, as where he relies on alibi, does not deprive him of the right to avail himself of other defenses, although based on the theory of justification or excuse." 22 C.J.S. Criminal Law, § 54, p. 118.

To like effect is Abbott, Criminal Trial Practice (4th ed., 1939) § 371, p. 675.

The common goals of all trials, civil and criminal, of issues of fact is to arrive at the truth, and it would seem that inconsistent positions should be permitted or not permitted according to whether they might help or hinder a search for the truth. Perhaps that may depend upon the degree of inconsistency.

In most common law jurisdictions, prior to the advent of statutes or rules like the Federal Rules of Civil Procedure, the admissibility of inconsistent pleadings in civil actions depended upon their degree of inconsistency. With ample citations of authority, the rule is thus stated in 71 C.J.S., Pleading, § 125, pp. 275, 276:

> "*The test of inconsistency inhibited*, whether merely an inconsistency or an inconsistency that is contradictory or repugnant, is whether the proof of one necessarily disproves the other. It is no test that if one is proved the other is unnecessary.
> \* \* \* "

See also, 41 Am.Jur., Pleading, §§ 47, 48.

■ If the evidence fails to prove by the required standard that the defendant committed the act charged or had the

---

3. State v. Parr, Mont., 283 P.2d 1086.

4. People v. Schwartz, 109 Cal.App.2d 450, 240 P.2d 1024, 1027; People v. Johnson, 99 Cal.App.2d 559, 222 P.2d 58, 59;

People v. Lee, 9 Cal.App.2d 99, 48 P.2d 1003, 1007; Accord: Nutter v. United States, 4 Cir., 289 F. 484; Annotation 33 A.L.R.2d 886.

requisite criminal intent, then, of course, the defense of entrapment is unnecessary. See Sassnett v. State, 156 Fla. 490, 23 So.2d 618. Usually, however, that cannot be foretold when the proof is being offered in advance of the jury's verdict. Then, according to the circumstances and the nature of the case, proof of entrapment may or may not be so contrary or repugnant to proof that the defendant is otherwise not guilty, or rather to a lack of the required proof that the defendant is otherwise guilty, that the proof of the one necessarily disproves the other. For example, in the cases cited in footnotes 3 and 4, *supra,* it was held that the defendant's denial of the single specific act charged precluded him from relying on the defense of entrapment. On the other hand, in the Florida case of Sassnett v. State, supra, the court held that the proof failed to establish the requisite criminal intent to steal the bull, but strongly intimated that, if the defense of entrapment had been needed, it would have been available because of the activities of the constable in first inducing the defendant to take the bull out of pound and then arresting him for larceny. So here, it seems to us that the defendant could admit operating the illicit still, deny being a party to the conspiracy charged, and still defend on the ground that such overt acts as he did commit were done as a result of entrapment; he could say, "I did not go so far as to become a party to the conspiracy, but to the extent that I did travel down the road to crime, I was entrapped." The two defenses do not seem to us so repugnant that proof of the one necessarily disproves the other. Whether a greater degree of inconsistency in defenses should be permitted need not be decided in this case. We hold that the district court was not justified in declining to charge on entrapment as to Henderson by the theory which it assigned (footnote 1, *supra*).

Was there another reason, a sound reason, which would justify that action of the district court? The authoritative exposition of the doctrine of entrapment as applied in the federal courts is contained in the case of Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; see United States v. Sherman, 2d Cir., 200 F.2d 880, 882. Speaking for the minority, consisting of himself and Justices Brandeis and Stone, Justice Roberts thought the defense was based upon the following rationale:

"Always the courts refuse their aid in civil cases to the perpetration and consummation of an illegal scheme. Invariably they hold a civil action must be abated if its basis is violation of the decencies of life, disregard of the rules, statutory or common law, which formulate the ethics of men's relations to each other. Neither courts of equity nor those administering legal remedies tolerate the use of their process to consummate a wrong. The doctrine of entrapment in criminal law is the analogue of the same rule applied in civil proceedings. And this is the real basis of the decisions approving the defense of entrapment, though in statement the rule is cloaked under a declaration that the government is estopped or the defendant has not been proved guilty." Sorrells v. United States, supra, 287 U.S. at page 455, 53 S.Ct. at page 217.

Chief Justice Hughes, speaking for the Court, concluded his exposition of the rationale of the defense as follows:

"The defense is available, not in the view that the accused though guilty may go free, but that the government cannot be permitted to contend that he is guilty of a crime where the government officials are the instigators of his conduct. The federal courts in sustaining the defense in such circumstances have proceeded in the view that the defendant is not guilty. The practice of requiring a plea in bar has not obtained. Fundamentally, the question is whether the defense, if the facts bear it out, takes the case out of the purview of the statute because it cannot be supposed that the Congress intended that the letter of its

enactment should be used to support such a gross perversion of its purpose." Sorrells v. United States, supra 287 U.S. at page 452, 53 S.Ct. at page 216.

See also, Demos v. United States, 5 Cir., 205 F.2d 596, 599.

The majority opinion in Sorrells v. United States, supra, is, of course, binding upon this Court. There it is made clear that the defense of entrapment is permitted not because the defendant is justified or excused on account of having been induced to commit the crime, but because the Court reads out of the definition of the crime itself cases where a person otherwise innocent has been induced by officers of the law to commit the crime in order that he might be prosecuted. To quote further from that opinion:

"We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them. We are not forced by the letter to do violence to the spirit and purpose of the statute. This, we think, has been the underlying and controlling thought in the suggestions in judicial opinions that the government in such a case is estopped to prosecute or that the courts should bar the prosecution. If the requirements of the highest public policy in the maintenance of the integrity of administration would preclude the enforcement of the statute in such circumstances as are present here, the same considerations justify the conclusion that the case lies outside the purview of the act and that its general words should not be construed to demand a proceeding at once inconsistent with that policy and abhorrent to the sense of justice. This view does not derogate from the authority of the court to deal appropriately with abuses of its process and it obviates the objection to the exercise by the court of a dispensing power in forbidding the prosecution of one who is charged with conduct assumed to fall within the statute." Sorrells v. United States, supra 287 U.S. at pages 448–449, 53 S.Ct. at page 215.

Again, that opinion expressed the controlling question as follows:

" * * * the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials. If that is the fact, common justice requires that the accused be permitted to prove it. The government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, and if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." Sorrells v. United States, supra 287 U.S. at page 451, 53 S.Ct. at page 216.

We have been cited to no case and have found none passing upon the question of whether the defense of entrapment can be sustained by proof of acts of inducement on the part of a state officer not under the direction of or in collaboration with any federal officer. Some pertinent authority may not have been discovered because that question has not been raised in brief or argument. The present record, however, does present for decision whether the answer to that question might furnish a sound basis for the action of the district court in declining to charge on entrapment as to Henderson. Hence, at the risk of raising a

straw man to knock him down, we proceed to consider that question.

■ Well settled, of course, it is that the doctrine of entrapment does not extend to acts of inducement on the part of a private citizen who is not an officer of the law. Kott v. United States, 5 Cir., 163 F.2d 984, 987. Jindra v. United States, 5 Cir., 69 F.2d 429, 431; Gargano v. United States, 5 Cir., 24 F.2d 625; Newman v. United States, 9 Cir., 28 F.2d 681, 682; Polski v. United States, 8 Cir., 33 F.2d 686, 687; Beard v. United States, 8 Cir., 59 F.2d 940, 941. There are expressions in Sorrells v. United States, supra, and in some of the cases just cited, which indicate that the doctrine of entrapment can be invoked only where the Government, acting through some of its own officers or agents, is chargeable with inducing the commission of the offense. See also, United States v. Sherman, 2d Cir., 200 F.2d 880, 882. On the other hand, some expressions in Sorrells v. United States, supra, and in some of those cases and the language of other authorities, are broad enough to include within the defense the acts of all officers of the law, state and federal, in inducing a person otherwise innocent to commit a crime in order that he might be punished therefor. See Butts v. United States, 8 Cir., 273 F. 35, 18 A.L. R. 143; 15 Am.Jur., Criminal Law, § 336. Expressions either way, however, not called for by the facts or circumstances of the case, are no more than dicta, entitled to weight only in so far as the reasons therefor may justify the language used; and, apparently, in none of the cases has the court had the distinction here presented so clearly in mind as to express its reasons for a ruling one way or the other. The language employed in the decisions is, therefore, of little help to us.

■ The apparent analogy which comes most readily to mind is the doctrine of the search and seizure cases under which evidence obtained by an illegal search or seizure by state officers, not made for the purpose of aiding in the prosecution of a federal offense, and in which no federal officer has taken any part, is admissible notwithstanding the illegality of the search or seizure. Boyd v. United States, 116 U.S. 616, 618, 6 S. Ct. 524, 29 L.Ed. 746; Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652; Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520; Gambino v. United States, 275 U.S. 310, 313, 316, 317, 48 S.Ct. 137, 72 L.Ed. 293; Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L. Ed. 1819; Rea v. United States, 350 U.S. 214, 216, 217, 76 S.Ct. 292. Those cases, however, rest upon reasoning not here applicable, principally upon disciplinary considerations tending to practical respect for the Fourth Amendment. True, those cases are based also on the conclusion that state officers, under such circumstances, are not agents of the Federal Government.

The former jeopardy cases would seem to establish that, in the enforcement of their criminal laws, the state and federal governments occupy the positions of separate sovereignties. 15 Am.Jur., Criminal Law, § 394, and cases there cited.

■ It can plausibly be argued that, since the United States and the States are each autonomous, and the employees of the one are not the agents of the other, the defense of entrapment to commit a crime against the United States cannot be based upon acts of inducement by a state officer. In our opinion, however, that conclusion does not necessarily follow. State officers do not stand in the same relation to the United States as if they were private citizens, or were officers of a foreign sovereignty. To the contrary, all executive officers of the several states are bound by oath or affirmation to support the Constitution of the United States. Art. VI, Clause 3 of the Constitution; 4 U.S.C.A. § 101.

■ It was at an early date questioned whether the Congress could constitutionally impose upon state officers the power and duty to enforce federal criminal law, Prigg v. Pennsylvania, 16 Pet. 539, 615, 10 L.Ed. 1060; but that

issue has now been settled in the affirmative upon the basis of the supremacy clause, and of "the fact that the States of the Union constitute a nation." Testa v. Katt, 330 U.S. 386, 389, 67 S.Ct. 810, 812, 91 L.Ed. 967. There the Court definitely "repudiated the assumption that federal laws can be considered by the states as though they were laws emanating from a foreign sovereign." 330 U.S. at pages 390, 391, 67 S.Ct. at page 813.

In the present instance, Congress has imposed no affirmative duty upon the state officers to enforce the federal criminal law. It was, nevertheless, entirely proper and permissible for the state officers to cooperate to that end. In the language of Mr. Justice McKenna speaking for the Court in Hoke v. United States, 227 U.S. 308, 322, 33 S.Ct. 281, 284, 57 L.Ed. 523:

> "Our dual form of government has its perplexities, state and nation having different spheres of jurisdiction, as we have said; but it must be kept in mind that we are one people; and the powers reserved to the states and those conferred on the nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral."

Professor Corwin has well remarked (Constitution of the United States of America, Revised and Annotated, 1952, at page 739): "Nowadays, there is constant cooperation, both in peacetime and in wartime, in many fields between National and State Officers and official bodies." While state officers are not agents of the United States, yet under the cooperative conception of the federal system, they bear to the Government a much closer relationship than strangers.

 The just rule seems to us to be that, when a state officer has induced a person otherwise innocent to commit a crime in order to punish him therefor, the United States cannot take over the task of punishment by prosecuting for the federal offense without allowing the defense of entrapment, the same as if the inducement had been by a federal officer. The moral wrong in each instance is equally grave, and each is equally outside of and contrary to the spirit of the statute defining the federal offense. In our opinion, the same high public policy in the maintenance of the integrity of administration which precludes the enforcement of a federal criminal statute, when Government officials have lured persons otherwise innocent to its violation in order that they might be punished, is sufficiently broad to include acts of inducement on the part of all officers of the law, state and federal alike. We, therefore, find no sound basis for the action of the district court in declining to charge on entrapment as to Henderson.

 Robbins admits his acceptance of the bribe money and having promised protection for the moonshine operation, as testified to by Wood and Behan, but defends on the ground that he had no criminal intent. He insists that he was merely feigning participation in the conspiracy to lay a trap for the "big boys", the financial backers of the criminal activities. To corroborate his contentions as to his good faith activity as a law enforcement officer, he produced the jailer, several members of the sheriff's force, a local constable, a policeman, and a county judge, all of whom to some extent substantiated his claims of having reported the substance of his interviews with Wood and Behan, his receipt of their bribe money, and its preservation as evidence against them. However, there is other evidence showing that, during the several months of his participation in the scheme, Robbins never reported the existence or progress of his own investigation to any state or federal officials charged with any independent responsibility and duty of liquor law enforcement, nor did he ever arrest any of the participants in the actual illicit distilling operations even though he admittedly knew who they

were and apparently had ample opportunity to do so. On the contrary, according to the testimony presumably believed by the jury, his participation was not solely for the purpose of passive surveillance to catch the "big boys", but actually extended to actively aiding and abetting of the illegal activities, in violation of federal law and in such manner as to subject himself to prosecution therefor, by warning the actual operators when it was advisable to move the still, leaving a red string or flag near the still site as a danger signal to let them know it was under observation, and, after the last raid in early January, 1955, advising them to "lay low" for awhile, change their car tags and paint their cars a different color just in case they had been under observation at the still site. The jury was justified in finding Robbins' own claims inconsistent and contradictory, for Robbins testified that he intended to arrest Wood as soon as Wood brought him a promised five-gallon jug of "shine", and at the same time insisted that he was not after the actual operators, but only waiting to catch the "big boys" from whom they received their financial backing, even though the testimony fails to justify any reasonable expectation that the "big boys" would ever appear. Furthermore, he did not arrest White even after White told him that he was financing the moonshine operation, and, while White as a newcomer to the business may not have been one of the "big boys" for whom Robbins was professedly waiting, the jury could consider his failure to arrest White in ascertaining the consistency and sincerity of his contentions. The jury had the benefit of seeing and hearing Robbins and his witnesses testify, and was in a better position to judge of their credibility than is this Court. There is abundant evidence to sustain its verdict.

The judgments of conviction against Dees and Robbins are affirmed, and that against Henderson is reversed, and his case is remanded for a new trial.

Affirmed in part and in part reversed and remanded.