**UNITED STATES of America, Appellee,**

v.

**William R. PERL, Appellant.**

**No. 77–1416.**

United States Court of Appeals, Fourth Circuit.

Argued July 20, 1978.

Decided Sept. 22, 1978.

---

Hall, Circuit Judge, concurred in part and dissented in part and filed opinion.

Nathan Lewin, Washington, D.C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., on brief), for appellant.

Richard D. Bennett, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Circuit Judge, FIELD, Senior Circuit Judge, and HALL, Circuit Judge.

WINTER, Circuit Judge:

William R. Perl was convicted of willfully attempting to damage property utilized by foreign officials in violation of 18 U.S.C. § 970, of unlawfully receiving a firearm purchased outside the State of Maryland in violation of 18 U.S.C. § 922(a)(3), and of conspiring with unknown persons to commit these crimes in violation of 18 U.S.C. § 371. He was fined $12,000, given a two-year suspended sentence, and placed on three years' supervised probation. On appeal he urges a number of grounds of reversal, principally that the district court erroneously declined to give an entrapment instruction, that it erroneously instructed the jury on a defense not asserted at trial, and that it prejudicially confused the jury by its instructions on the conspiracy count. We agree that there was reversible error in the conspiracy conviction. The initial charge on this count was erroneous and the district court's attempt to cure the error was ineffective and likely left the jury in a state of confusion prejudicial to defendant. We therefore reverse defendant's conviction on the conspiracy count and award him a new trial. As to defendant's other contentions, however, we find no error and therefore affirm his conviction on both substantive counts.

### I.

The defendant, Dr. William R. Perl, has long been active in Jewish affairs, both in Europe and in this country, and, as a survivor of the Nazi persecutions, he has been particularly concerned about the welfare of Jews living in the Soviet Union. Among the organizations in which he has been active is the Jewish Defense League (JDL). He was a founder of the Washington, D. C., chapter of that organization and, at the time that the events material to the instant case commenced, was serving as its president. Both he and the Washington Chapter have a reputation for non-violence.

Sometime in 1973, an Israeli expatriate named Reuven Lev-tov attended a meeting of the Washington Chapter of the JDL held at the home of Dr. Perl. By all accounts, Reuven Lev-tov was and is a shadowy and intriguing figure. After ten years in the Israeli Navy, where he was a member of its elite "special forces," Lev-tov joined the Israeli foreign service and was assigned duty at the Israeli embassy in Washington as chauffeur and apparent bodyguard to the ambassador. In 1965, he married an American citizen and shortly thereafter was dismissed from service at the Israeli Embassy. In 1968, he returned to Israel for a three-year period before settling permanently in this country in 1971. He subsequently became a specialist in electrolysis, maintaining an office in Washington, D. C. Recently he renounced his Israeli citizenship, after having become an American citizen some ten years earlier.

At trial, Lev-tov testified that by 1973 he had come to feel bad about acts of terrorism perpetrated in the name of various Jewish causes and became determined to take some action to combat its spread. To this end, he conceived a plan to induce a leading Jewish figure to join him in committing some violent act. Before the commission of the act, however, it was Lev-tov's intention to turn his accomplice over to the authorities. He apparently chose as his victim Dr. Perl and, with this plan in mind, attended the 1973 JDL meeting at Dr. Perl's home.

At the conclusion of this meeting, Lev-tov managed to engage Dr. Perl in private conversation. Lev-tov made known his own concern for the plight of Soviet Jews and his availability to help carry out any act of violence suitable to Dr. Perl. Dr. Perl gave Lev-tov no encouragement, stating, according to Lev-tov, that "we don't do things like that here in Washington."

Nothing more occurred until the spring of 1976, by which time Dr. Perl had developed Parkinson's Disease and was under constant medication. On April 10, 1976, Dr. Perl and Lev-tov met at a motel in the Maryland suburbs and agreed that an appropriate form of protest would be to shoot out the windows of the apartments of two Soviet officials living in Prince George's County, Maryland. It was agreed that Lev-tov would do the actual shooting and that Dr. Perl would publicize the event and announce that it was the responsibility of the JDL. At a subsequent meeting, it was agreed that Dr. Perl would also supply the weapon and ammunition. Dr. Perl then took steps to obtain a rifle from JDL sources in New York. He was successful in these efforts and, on May 6, turned the weapon over to Lev-tov, and, on May 7, the ammunition to fire it. May 23, a Sunday, was fixed as the date for the shooting.

On May 19, Lev-tov went to the Israeli Embassy, there telling an official that he had been asked to shoot out the windows of two apartments belonging to Soviet officials. He was advised to contact "the authorities." However, before Lev-tov could make such contact he was approached at his office by two FBI agents who had been alerted to the situation by an attache at the Israeli Embassy. Lev-tov made a detailed statement to the agents concerning his association with Dr. Perl, and it was agreed that Lev-tov would continue with the plan. He was instructed to wear a body recorder at his next meeting with Dr. Perl, which was to take place on May 22. The recording was later introduced as evidence against Dr. Perl at trial. On May 23, the planned shooting was carried out with a weapon and blanks provided by the FBI.

On June 29, 1976, Dr. Perl was indicted for his role in the incident. Trial was held in November, 1976. Dr. Perl was convicted on three of the four counts on which he was charged, and this appeal followed.

## II.

Dr. Perl freely admits that he participated in the plan to shoot out the windows of the Soviet officials and that he provided Lev-tov a weapon for this purpose. At trial, his only defense was that he was entrapped by Lev-tov and that, therefore, no criminal liability should attach. In keeping with this theory of the case, the defense proposed three alternative entrapment instructions to the district court. The trial court rejected all three, instructing the jury flatly that "entrapment is not a defense in this case."

On appeal, defendant makes two separate arguments with respect to the entrapment defense. *First,* he contends that government involvement in the scheme to entrap should not be treated as a necessary element in the federal defense of entrapment and urges us to adopt this as the law of this circuit. *Second,* defendant argues that even if some government involvement is required, there exists sufficient evidence of such involvement in the instant case to entitle him to jury consideration of the defense. We do not agree with either contention.

The cases are legion which either hold directly or state as dictum that "[e]ntrapment cannot result from the inducements of a private citizen but must be the product of conduct by governmental agents." *United States v. Garcia,* 546 F.2d 613, 615 (5 Cir.), *cert. denied,* 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977).[1] On numerous occasions this court, without ever directly so

holding, has clearly expressed its view that federal law does not recognize the defense of private entrapment. *United States v. Tharpe,* 443 F.2d 12, 13 (4 Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 80, 30 L.Ed.2d 110 (1971); *United States v. DeVore,* 423 F.2d 1069, 1071 (4 Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971); *United States v. Comi,* 336 F.2d 856, 860 (4 Cir. 1964), *cert. denied,* 379 U.S. 992, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965); *United States v. Sizer,* 292 F.2d 596, 599 (4 Cir. 1961); *Crisp v. United States,* 262 F.2d 68, 69 (4 Cir. 1958).

Despite this vast array of precedent, defendant urges us to recognize a private-entrapment defense. Under defendant's theory, no showing of government involvement in the scheme to entrap need be made if there otherwise exists evidence that defendant was "induced to commit a crime he had no predisposition to commit solely and exclusively in order to have him handed over to the authorities." Defendant's Proposed Instruction No. 23. While we recognize that at least two states have adopted the defense of private entrapment,[2] we believe that federal courts must require some showing of government involvement in the alleged scheme to entrap before the defense is recognized.

Entrapment, as it exists in federal law, is a statutory defense. "It is rooted . . . . in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them *by the Government.*" *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973) (emphasis added). This view of legislative intent has remained firm since the Supreme Court first recognized entrapment as a fed-

---

1. *See, e. g., United States v. McClain,* 531 F.2d 431, 437 (9 Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *United States v. Maddox,* 492 F.2d 104, 106 (5 Cir.), *cert. denied,* 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974); *United States v. DeAlesandro,* 361 F.2d 694, 698–99 (2 Cir.), *cert. denied,* 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966); *Johnson v. United States,* 115 U.S.App.D.C. 63, 64, 317

F.2d 127, 128 (1963); *United States v. Romano,* 278 F.2d 202, 204 (2 Cir. 1960); *Polski v. United States,* 33 F.2d 686, 687 (8 Cir.), *cert. denied,* 280 U.S. 591, 50 S.Ct. 39, 74 L.Ed. 640 (1929).

2. *See People v. Moran,* 1 Cal.3d 755, 463 P.2d 763, 766 n.4 (1970); *Beasley v. State,* 282 P.2d 249, 254 (Okl.Cr.1955).

eral defense in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). There, Chief Justice Hughes wrote:

We are unable to conclude that it was the intention of the Congress in enacting [a criminal] statute that its processes of detection and enforcement should be abused by the instigation *by government officials* of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.

287 U.S. at 448, 53 S.Ct. at 215. Similarly, in *Lopez v. United States,* 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963), the Court observed that "[t]he conduct with which the defense of entrapment is concerned is the manufacturing of crime *by law enforcement officials and their agents.*" (Emphasis added and deleted.)

In view of this longstanding and authoritative interpretation of legislative intent, we hold that a defendant, in order to assert the defense of entrapment in a federal prosecution, must produce evidence of government involvement in the scheme to entrap. We therefore affirm the district court's rejection of defendant's private entrapment instruction.[3]

Alternatively, defendant argues that even if some showing of government involvement in the entrapment plan is required, there exists sufficient evidence of such involvement in the instant case to entitle defendant to a standard entrapment instruction.[4] Stated otherwise, defendant argues that the district court erred when it decided as a matter of law that even the traditional entrapment defense was unavailable to defendant. We disagree.

It is well established that entrapment is an affirmative defense and that the "initial burden [is on defendant] to go forward with some evidence, more than a scintilla, that [the government or its] agents induced him to commit the offense." *United States v. Harper,* 505 F.2d 924, 926 (5 Cir. 1974). "If a defendant fails to carry the burden on the issue of entrapment forward, he is not entitled to submission of the issue to a jury." *United States v. Groessel,* 440 F.2d 602, 606 (5 Cir.), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971). *Accord, Lopez v. United States, supra,* 373 U.S. at 435, 83 S.Ct. 1381; *United States v. DeVore, supra,* 423 F.2d at 1071. The duty of determining whether or not defendant has met this initial burden is that of the district judge. *United States v. Teeslink,* 421 F.2d 768, 771 (9 Cir. 1970).

In the instant case, the district court determined that defendant failed to carry his initial burden of showing some government involvement in Lev-tov's plan to entrap Dr. Perl. We cannot say that it erred in this determination. As we view the record, defendant did establish some government interest in the activities of Dr. Perl. It appears that the FBI had maintained a file on Dr. Perl for some years and

---

3. By government involvement, we mean involvement of federal, state or local law enforcement officials or their agents. *See Henderson v. United States,* 237 F.2d 169, 176 (5 Cir. 1956). We do not mean involvement by agents of a foreign government. One of defendant's three proposed entrapment instructions provided that the "defense of entrapment is open to the defendant . . . if [Lev-tov] was at [the time of entrapment] *working on behalf of the* Israeli government, if the Israeli government intended to turn Dr. Perl over to American law enforcement authorities." Defendant's Proposed Instruction No. 26. As we view it, the principal purpose of the entrapment defense as it has developed in the federal courts is to deter official misconduct in the investigation of criminal activity. As we have elsewhere said: "The defense of entrapment rests on the premise that the purpose of *law enforcement* is the prevention, not the manufacture, of crime." *United States v. DeVore, supra,* 423 F.2d at 1070. *See also United States v. Sizer, supra,* 292 F.2d at 599. This purpose would no more be served by extending the doctrine to include entrapment by foreign agents than it would be by extending the defense to include entrapment by private citizens. The district court, in our view, correctly rejected defendant's proposed instruction on foreign entrapment.

4. Defendant's Proposed Instruction No. 27 would have instructed the jury to acquit "if you have a reasonable doubt whether Reuven Lev-tov was acting on behalf of any agency of the United States government, and whether he prevailed upon Dr. Perl to commit offenses he would not otherwise have committed. . . ."

that, in April 1976, at the same time Dr. Perl and Lev-tov were formulating their plans, a subpoena was issued to obtain Dr. Perl's telephone records. We do not think, however, that such evidence of government interest in Dr. Perl could reasonably support an inference of government involvement in Lev-tov's entrapment scheme. Without even a scintilla of evidence to back up his speculations as to government involvement, defendant was simply not entitled to jury consideration of his entrapment defense.[5] *Cf. United States v. DeVore, supra* (defendant held not entitled to jury instruction on entrapment where he produced evidence of government solicitation but failed to produce evidence of government inducement sufficient to create a doubt that defendant was otherwise predisposed to commit the crime); *United States v. Comi, supra* (defendant held not entitled to jury instruction on entrapment where there existed no evidence that any government agent initiated or in any way induced the defendant to commit the crime).

**5.** Defendant relies heavily on *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), for the proposition the government involvement need be neither great nor direct in order for the entrapment defense to be available. While we agree that *Sherman* allows an entrapment defense even where the government has neither prior knowledge of nor direct involvement in the scheme to entrap, it still requires a showing that the government and the entrapper have an established relationship such that the government is estopped from denying responsibility for the entrapment. In the instant case, defendant produced not a shred of evidence linking Lev-tov to the United States government. Some direct proof of prior dealings between government and entrapper is a prerequisite to raising a *Sherman* type entrapment defense. *See also United States v. Comi, supra*, 336 F.2d at 860–61.

**6.** In full, the district court's "*Berrigan*" instruction, which had been requested by the government, was as follows:

Intent and motive should never be confused. Motive is that which prompts a person to act. Intent refers only to the state of mind with which the act is done.

Personal advancement, financial gain, political reason, religious beliefs, moral convictions or some adherence to a higher law even of nations are well recognized motives for human conduct. These motives may prompt

### III.

Defendant next contends that the district court erred in giving a so-called "*Berrigan*" instruction. *See United States v. Berrigan*, 283 F.Supp. 336 (D.Md.1968), *aff'd sub nom., United States v. Eberhardt*, 417 F.2d 1009 (4 Cir. 1969), *cert. denied*, 397 U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970). In essence, this portion of the charge instructed the jury that moral convictions or adherence to a "higher law" constitute no legal justification for criminal activity.[6] Defendant asserts that it was improper for the district court to give this instruction in light of defendant's repeated disclaimers throughout the trial of any reliance on a "higher-law" defense. We disagree.

It is, of course, well established that the introduction of an extraneous and irrelevant legal issue into the case by way of the district court's charge to the jury may so confuse or mislead the jury that a new trial is warranted. "It is not the function of the

one person to voluntary acts of good and another to voluntary acts of crime.

The law does not recognize political, religious, moral convictions or some higher law as justification for the commission of a crime no matter how good that motive may be. The reason this is so is that such personal motives or firm beliefs, if you will, would enable the individual holder to select the law which he would obey according to those beliefs. These personal convictions could prompt him to steal, rob, commit assaults upon those holding contrary views and even to kill, under certain circumstances.

Or, to put it another way, as Mr. Justice Goldberg said in the case of *Cox v. Louisiana:*

The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost.

And he went on further to say in that case:

We also reaffirm the repeated decisions of this Court, meaning the Supreme Court of the United States, that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of a peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and a place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations.

trial judge to instruct the jury on abstract principles of law which have no bearing on the case. Extraneous *law* may be quite as prejudicial as extraneous *facts*. Verdicts should be based only on the evidence in the case and the pertinent law as applied to that evidence." *United States v. Hill*, 417 F.2d 279, 281 (5 Cir. 1969). *See also Michaud v. United States*, 350 F.2d 131 (10 Cir. 1965); *Morris v. United States*, 326 F.2d 192 (9 Cir. 1963); *United States v. Leggett*, 312 F.2d 566 (4 Cir. 1962).

■ We are not persuaded, however, that the court's *"Berrigan"* charge was extraneous to the instant case. It is true that defendant from the outset disclaimed any reliance upon a "higher-law" defense. Nonetheless, we agree with the government that implicit in both the testimony of defense witnesses and defendant's closing argument was the suggestion that Perl's deep concern for the plight of Soviet Jewry in some way explained his criminal activities. The district court, which was in a position to assess firsthand the tenor of the trial, may properly have concluded that the jury, however attentive, could well confuse logical explanation with legal justification and that the best way to prevent such confusion was to caution the jury against being swayed by Dr. Perl's motives. From the record before us, we cannot say that the district court acted unreasonably in this regard.

## IV.

■ In Count One of the indictment, Dr. Perl was charged under 18 U.S.C. § 371 with conspiring with unknown persons (presumably his JDL "sources" in New York) to obtain illegally a firearm for the purpose of damaging property occupied by foreign officials. Because Lev-tov, throughout his association with Dr. Perl, lacked any intention of committing a criminal act, he was not charged as a co-conspirator.

Defendant was naturally concerned that the jury would improperly use evidence of his dealings with Lev-tov as proof of the conspiracy with which he was charged. Consequently, defendant asked for the following cautionary instruction:

> A conspiracy is an agreement between two or more persons to engage in conduct that violates the law. Dr. Perl is charged in this case with being a conspirator in an illegal scheme in which various persons unknown to the grand jury were allegedly other participants. The indictment does not charge that Dr. Perl conspired .with Reuven Lev-tov, and you may not regard any apparent agreement between Dr. Perl and Mr. Lev-tov as the conspiracy charged in Count One of the indictment. To find Dr. Perl guilty of the charge in Count One of the indictment you must find beyond a reasonable doubt that Dr. Perl was a member of a conspiracy composed of persons other than Reuven Lev-tov:

Despite the manifest correctness of this statement of law,[7] the district court declined to give the requested instruction. Instead, it told the jury that "the First Count has to do with conspiracy, that's an agreement between—charged between Reuven Lev-tov and the Defendant and other persons unknown." After defense counsel objected to the inclusion of Lev-tov in the conspiracy instruction, the district court attempted to cure the error as follows:

> Members of the jury, it has been called to my attention that I said Reuven Lev-tov was a co-conspirator. He was not so charged in the indictment. He was part of the agreement, but not of the conspiracy. The conspiracy is with people unknown at the time the indictment was— right?

Defense counsel again objected, arguing that the distinction between being a party

7. *See, e. g., Johnson v. Sheriff,* 91 Nev. 161, 532 P.2d 1037, 1038 (1975); *People v. Atley,* 392 Mich. 298, 220 N.W.2d 465, 472 (1974); *State v. Horton,* 275 N.C. 651, 170 S.E.2d 466, 470 (1969), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2175, 26 L.Ed.2d 545 (1970); *Delaney v. State,* 164 Tenn. 432, 51 S.W.2d 485 (1932); *see also* 15A C.J.S. Conspiracy § 37 at 731; Perkins on Criminal Law 622 (2d ed. 1969); Developments-Criminal Conspiracy, 72 Harv.L.Rev. 920, 926 (1959).

to an agreement and being a party to a conspiracy was confusing to the jury and that a more precise instruction was required. The district court, however, agreed with the government that it was simply a matter of "semantics" and concluded to "let it stand the way it is."

Because we think that the original instruction on conspiracy was erroneous and that defendant was entitled to a clear and unequivocal correction of the error which he failed to receive, we reverse his conviction on the conspiracy count. This was not the typical conspiracy case. The principal dealings occurred between Dr. Perl and Lev-tov, and most of the evidence adduced at trial was material only to them. The unknown persons charged as co-conspirators were at best minor players at the fringes of the major plot. Because the conspiracy charged in this case was not central to the drama being played out to the jury, the jury should have been carefully admonished to exclude from its consideration of conspiracy all evidence of any agreement between defendant and Lev-tov. Such an instruction was not given. In the absence of such an instruction, there was on the facts a substantial likelihood that the defendant was prejudiced; because, despite a conscientious attempt to follow the district court's instructions, the jury may well have convicted the defendant for conspiring with Lev-tov. We, therefore, reverse his conviction on Count One of the indictment and direct that he be awarded a new trial on this charge.

## V.

■ We find no merit in either of defendant's remaining assignments of error. Even if, as defendant asserts, the district court erred in excluding certain expert testimony which the court felt came within the

notice requirement of F.R.Crim.P. 12.2(b),[8] we think that defendant suffered no prejudice as a result of this action. Since the excluded testimony bore relevance only to the entrapment defense, which, as we have already discussed, was properly withheld from jury consideration, any error in excluding such testimony was necessarily harmless. F.R.Crim.P. 52(a).

■ Likewise, we see no prejudice to defendant in the clerk's entry into the jury room to inquire whether the jury would continue its deliberations into the evening hours or instead would adjourn to the next working day. Certainly none of the cases cited by defendant suggest that such a minor and benign intrusion into jury privacy warrants a reversal of a verdict otherwise properly reached.

*AFFIRMED IN PART; REVERSED IN PART; NEW TRIAL AWARDED.*

K. K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in the statement of facts and in Parts II, III and V of the opinion, but must respectfully dissent from Part IV in which the majority holds that the curative instruction on the issue of conspiracy was so confusing as to constitute reversible error.

The instruction, while inartful, stated that Reuven Lev-tov was not part of the conspiracy charged, but rather that the conspiracy was with persons unknown. On the basis of this instruction, I fail to see how the jury could have convicted Dr. Perl for conspiring with Lev-tov. Therefore, I would affirm the verdict of guilty on the charge of conspiracy.

---

8. Rule 12.2(b) provides that "[i]f a defendant intends to introduce expert testimony relating to a mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intent . . .."

Subdivision (d) authorizes the court to exclude such testimony "[i]f there is a failure to give notice when required by subdivision (b) . . .." Defendant concedes that no notice was given but argues that the proffered testimony, which spoke to Dr. Perl's increased susceptibility to suggestion as a result of the medication he was taking, lay outside the scope of Rule 12.2(b). We have no need to reach this question.