946 F.2d 888
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Neil W. STEINHORN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eugene PETASKY, Defendant-Appellant.
 Nos. 90-5380, 90-5383.
 United States Court of Appeals, Fourth Circuit.
 Argued July 12, 1991.
Decided Oct. 11, 1991.
As Amended Nov. 22, 1991.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Paul V. Niemeyer, District Judge. (CR-90-22-PN)
 Argued: Richard Melvin Karceski, White & Karceski, Towson, Md., for appellant Steinhorn; Charles Gerald Bernstein, Bernstein, Sarkellaris & Ward, Baltimore, Md., for appellant Petasky; Gary Patrick Jordon, First Assistant United States Attorney, Baltimore, Md., for appellee.
 On Brief: Richard D. Bennett, United States Attorney, Baltimore, Md., for appellee.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Defendants Neil Steinhorn and Eugene Petasky appeal their convictions stemming from money laundering and the transportation of stolen goods. Seven issues are presented: (1) whether the district court erred when it refused Steinhorn's request to instruct the jury on the law of entrapment; (2) whether the court's finding that the government acted in good faith in refusing to move for a downward departure for Steinhorn under Sentencing Guidelines § 5K1.1 was clearly erroneous (3) whether the court violated Steinhorn's right of confrontation under the Sixth Amendment when it admitted recorded statements by an informant who did not testify; (4) whether the court abused its discretion by not questioning the entire jury after excusing of one of its members; (5) whether the court erred in admitting into evidence second hand precious metal reports; (6) whether the court erred in admitting under rule 801(d)(2)(E) Fed.R.Evid. recorded statements of Steinhorn made after the sale of gold jewelry on January 10, 1989; and (7) whether the government offered sufficient evidence to prove that Steinhorn and Petasky believed that the stolen gold would travel in interstate commerce. Finding no error in either conviction, we affirm.
 
 I.
 A.
 
 2
 Neil Steinhorn and Eugene Petasky were tried by a jury in U.S. District Court for the District of Maryland between May 21, 1990 and June 4, 1990. Petasky was charged under Count One of the superseding indictment with conspiracy to transport stolen goods in interstate commerce in violation of 18 U.S.C. § 371. Steinhorn was also charged under Count One, as well as with structured transactions to evade reporting requirements in violation of 31 U.S.C. § 5324 under Counts Two through Nine, and with laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(3) under Counts Ten through Twelve.
 
 
 3
 On June 4, 1990, the jury convicted both Petasky and Steinhorn on all charges. On September 6, 1990, Petasky was sentenced to 90 days home detention, two years of supervised release, and a $10,000 fine; Steinhorn was sentenced to 33 months incarceration and two years of supervised release. Petasky and Steinhorn appealed in a timely fashion. Petasky has completed his service of home detention, while Steinhorn was released pending appeal.
 
 B.
 
 4
 On November 8, 1988, Christopher Turner approached the FBI and allegedly said that his attorney, Neil Steinhorn, offered to exchange Turner's stolen gold jewelry and stolen money for laundered money.[1] Turner, at that time, had pled guilty to criminal charges in state court and had been released pending sentencing to allow him to make restitution as well as to cooperate with a Baltimore County police officer assigned to the DEA in making drug purchases. Turner, two months prior to his sentencing, decided to cooperate with the FBI as well, against his attorney Steinhorn. In return for Turner's efforts, the FBI agreed to advise the state judge of his cooperation. There is, however, no evidence that either the DEA or the FBI put Turner up to inducing Steinhorn to commit the offenses charged.
 
 
 5
 The FBI wired Turner with a recording device which documented meetings between Turner and Steinhorn. During these meetings which began on November 18, 1988, the two men discussed converting Turner's stolen gold jewelry to cash and laundering $250,000 in money purportedly stolen from an armored truck. Steinhorn described the manner in which Eugene Petasky, who ran a pawn shop, would assist in converting the gold and how money could be routed through Steinhorn's escrow account in amounts under $10,000 to an account on the Caribbean island of Nevis and then back to the United States of America, to avoid IRS detection. According to the discussions, Steinhorn would receive $100,000 for his efforts to launder the money. Moreover, Petasky agreed to sell the gold to a dealer in Cincinnati, Ohio.
 
 
 6
 The FBI continued the investigation into the latter part of December of 1988, secretly recording meetings and telephone calls between Turner and Steinhorn. Following one such telephone call on December 20, 1988, Turner disappeared, and has not been heard from since. The FBI, undeterred, continued the investigation with one of its own agents, Edward Dickson, posing as a partner of Turner, using the pseudonym "Slim Martin."
 
 
 7
 The investigation, which included fifty to sixty recorded conversations, led the FBI to the codefendant Petasky. With the FBI supplying its gold and money as stolen gold and money, the investigation documented a sale of the gold through Petasky and Steinhorn to a precious metal dealer from Cincinnati, Ohio. It also documented the money laundering scheme.
 
 
 8
 In terms of the issues raised, the central incident of the investigation occurred on January 10, 1989. Dickson or "Slim" met with Steinhorn on the day before. He asked Steinhorn how the money that he revealed, $50,000 in U.S. currency, might be laundered. Steinhorn explained it could be deposited in banks in amounts less than $10,000 to avoid IRS detection.
 
 
 9
 After Steinhorn placed a call to Petasky, the two men walked to Metro Broker Ltd., Petasky's pawn shop. Dickson gave a large quantity of gold jewelry to Petasky, advising him that it came from Piercing Pagoda, the store from which Turner stole jewelry. Petasky explained that Steinhorn would create an estate for a client and advise Petasky that the client wanted to scrap some gold. Petasky would then contact a person from Cincinnati who would come to Baltimore to pick up the gold. Dickson agreed to leave the jewelry to be sold with Petasky as long as he received a deposit. Petasky wrote a check for $1,000 to Steinhorn, exchanged the check for the same amount from his register, and gave the money to Steinhorn for Dickson. Steinhorn subsequently gave Dickson the cash after they departed Metro Broker. The defendants were subsequently indicted.
 
 II.
 A.
 
 10
 Steinhorn argues that he was entitled to an entrapment instruction on two grounds. First, he posits that in considering whether entrapment was an issue in this case the activities of Christopher Turner, prior to his contact with the FBI, must be considered as those of a government agent. Second, assuming that this was the case, the $100,000 fee offered to Steinhorn for the laundering of $250,000, in light of the fact that the maximum legal fee the accused ever received was a mere fraction of that amount, constituted inducement rather than mere solicitation.
 
 
 11
 This circuit has held that the entrapment defense requires the involvement of an agent of the government and may not be raised where the inducement to commit a crime comes from a private citizen. United States v. Perl, 584 F.2d 1316 (4th Cir.1978). Even if it is conceded that Turner's activities with the DEA transformed him into an agent, there is simply no inducement. It should be kept in mind that Turner contacted the FBI concerning Steinhorn sua sponte. Steinhorn's argument is essentially that solicitation constitutes inducement when the promised fruit of the illicit activity, like the fabled apple of the Garden of Eden, becomes too tempting to resist. Steinhorn argues that the $100,000 offer "creat[ed] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." United States v. Ortiz, 804 F.2d 1161 (10th Cir.1986). As a practical matter, where is the line to be drawn between solicitation and inducement, how much money is too much? This argument did not avail Adam and Eve, nor does it avail Steinhorn.
 
 B.
 
 12
 Upon being confronted by the FBI with the fact that his laundering scheme was conducted with an agent, Steinhorn expressed a willingness to cooperate. The U.S. Attorney's office provided a signed letter that stated if it was satisfied that Steinhorn made a good faith effort to provide substantial assistance in the investigation or prosecution of others, the government would advise the sentencing court of Steinhorn's cooperation. The government, however, advised the sentencing court:
 
 
 13
 Mr. Steinhorn's subsequent efforts in an undercover capacity against Eugene Petasky and Marc Rothstein were less than satisfactory in that he failed to follow government directions to make the stolen nature of the property explicit and, thus to eliminate any ambiguity about the transactions under discussion.
 
 
 14
 There are two principal sources of dissatisfaction, according to the government. First, Steinhorn appears to have admitted on crossexamination that he believed Turner had a large amount of cash in New York from the sale of stolen cars, not from an armored car robbery as was discussed with investigators. According to the government, Steinhorn also admitted lying to investigators about Petasky's phone calls to him between December 9, 1988 and May 25, 1989, and about the records kept of the January 1989 gold transaction.
 
 
 15
 In United States v. Francois, 889 F.2d 1341, 1343-44 (4th Cir.1989), cert. denied, 110 S.Ct. 1822 (1990), this court held that a sentencing court may grant a downward departure for substantial assistance to the government under § 5K1.1 of the Federal Sentencing Guidelines. Moreover, 18 U.S.C. § 3553(e) also requires a motion by the government to trigger credit at sentencing for cooperation. Given the language of the letter, the apparent dissatisfaction of the government as well as the factual findings of the district court supporting the government's contentions, we cannot say the government exercised bad faith.
 
 C.
 
 16
 The government presented covertly taped conversations between Turner and Steinhorn. As Turner was unable to testify, Steinhorn objected to the admission of the statements on the basis of hearsay. The district court admitted the tapes not for the truth being offered by Turner but rather to set the context for the statements of Steinhorn. Moreover, the judge gave limiting instructions prior to playing the tapes.
 
 
 17
 The Fifth Circuit was confronted with precisely this issue in United States v. Gutierrez-Chavez, 842 F.2d 77 (5th Cir.1988). The court held that tape recorded testimony, challenged as hearsay, was indeed admissible for the limited purpose of putting the responses of the appellants in context and making them comprehensible to the jury. Id., at 81. See also United States v. Jordon, 810 F.2d 262, 264 (D.C.Cir.1987) cert. denied, 481 U.S. 1032 (1987); United States v. Price, 792 F.2d 994, 996-97 (11th Cir.1986); United States v. Whitman, 771 F.2d 1348, 1352 (9th Cir.1985).
 
 D.
 
 18
 Next, Petasky asserts that the district court abused its discretion by not questioning the entire jury following the excusing of one of the jurors. This claim stems from the fact that the trial court was informed that during the voir dire process one of the panel members was overheard stating: "I'm for the government."
 
 
 19
 The district court questioned the juror as to whether the statement was made. The juror denied having made the remark. Nevertheless, the court, with the agreement of all counsel, excused the juror. Moreover, the court described the excusal as a "prophylactic" measure "rather than any recognition of a problem." Subsequently, Petasky asked the court to question the entire jury to determine whether the excused juror discussed the case with anyone else.
 
 
 20
 This claim is without merit. Where the district court excused a juror who may have made a statement evincing personal prejudice, as opposed to the revelation of prejudicial information, and declined to question the entire jury regarding the comment, we find no abuse of discretion.
 
 E.
 
 21
 Petasky next avers that the district court erred in the admission of reports filed with the Baltimore City Police Department. These reports concerned Metro Broker's secondhand precious metal transactions on January 10, 1989. These "Secondhand Precious Metals & Gem Dealers and Pawnbroker Daily Returns" were to be filed pursuant to Article 56, § 422, Annotated Code of Maryland, whenever Metro Broker acquired secondhand metal. The gold that Petasky took possession of on January 9, 1989 that was the subject of the January 10, 1989 illicit transaction was not recorded in returns for that latter day. The government argued that guilt could be inferred from the returns. The court instructed, over objection, that the jury could infer guilty knowledge from the absence of any notation of the illegal transaction.
 
 
 22
 Petasky avers that Article 56, § 422, Annotated Code of Maryland is inapplicable. The basis of his claim is twofold. First, Dickson's sale of the gold jewelry was not an acquisition of secondhand precious metals, the triggering act for the filing of the records. Second, the introduction of the Reports for January 10, 1989 violated Petasky's Fifth Amendment right against self-incrimination. Thus, the Reports were inadmissable.
 
 
 23
 With respect to the "acquisitions" leg of the argument, Article 56, § 422 governs those "engaged in the business of buying, acquiring, or trading commercially with members of the public in secondhand precious metals in this State or ... a pawnbroker." Md.Ann.Code (Supp.1990) art. 56, § 416(f)(1). Moreover, Article 56, § 422(a)(1) states that:
 
 
 24
 Each dealer shall maintain written records on forms supplied by the Secretary (State Secretary of Licensure & Regulation) of all business transactions involving acquisitions of precious metals at the time the transactions are made. Md.Ann.Code (1988).
 
 
 25
 As the term "acquisition" has yet to be defined by the Maryland Court of Appeals, we are called upon to predict how it would interpret the statute. Wilson v. Ford Motor Company, 656 F.2d 960 (4th Cir.1981). The Maryland Court of Appeals, however, provides a hermeneutical principle for our task; this principle being that "where possible, statutes dealing with the same subject matter should be construed as supplementary to each other." State v. Fisher, 104 A.2d 403, 406 (1954).
 
 
 26
 Applying this rule in the instant case, we turn to Article 56, § 423(a). This section states:
 
 
 27
 All precious metals that come into the possession or control of a dealer shall be held by the dealer in the jurisdiction of the law enforcement agency with which the dealer files his records for 18 days after the dealer has complied with the record filing requirements of § 422 of this subtitle. Md.Ann.Code (1988)
 
 
 28
 The reference to § 422 indicates that the state legislature intended for the sections to complement one another. If acquisition is understood as coming "into possession or control" then the reference to § 422 by § 423 makes sense. If, however, acquisition is read to mean only obtaining legal title then the reference is gratuitous. Thus, § 422 is applicable. With respect to the Fifth Amendment leg of the argument, Petasky failed to raise it below, he lacks standing to do so now.[2] The trial court did not err in admitting the records.
 
 F.
 
 29
 Petasky's challenge to the admissibility of three recorded conversations between Steinhorn and Agent Dickson occurring on January 10th, 11th, and 12th of 1989 also fails. He contends that these conversations occurred after the termination of the conspiracy; thus, they are inadmissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. In order for a statement to fall within the definition of the Rule, there must be supporting evidence "that there was a conspiracy involving the declarant and the nonoffering party, and the statement was made 'during the course and in furtherance of the conspiracy.' " Bourjaily v. United States, 483 U.S. 171, 175 (1987).
 
 
 30
 There is substantiating evidence, namely several statements by Petasky himself, of an ongoing conspiracy. Moreover, Count One charges that "from in or about November 1988 and continuing to in or about January 1989, the exact date being unknown to the Grand Jury," Steinhorn and Petasky conspired "with each other and with others unknown to the Grand Jury to transport in interstate commerce stolen goods, wares, and merchandise having a value of $5,000 or more." Moreover, the time period of the conspiracy is determined by the evidence presented at trial, not dates alleged in the indictment. United States v. Jackson, 757 F.2d 1486, 1490 (4th Cir.1985). The trial judge concluded that there was no evidence to indicate that the conspiracy terminated on January 10, 1991, the date of the Metro Broker transaction. The judge stated that:
 
 
 31
 There was nothing to indicate that there was an ending or termination, that anybody thought that the relationship or the purposes or the functions of the parties had in any way changed on the 10th.
 
 
 32
 This finding is not clearly erroneous. There is corroborating evidence of the conspiracy beyond January 10. Petasky described to Dickson on the January 9 meeting a preexisting arrangement in which Steinhorn would open an estate for a client then have Petasky dispose of gold as property of the estate. Moreover, Petasky suggested to Turner that he was in the business of making illicit "big deals" involving stolen gold. Thus, we hold that the recorded statements were made during the course of the conspiracy.
 
 G.
 
 33
 Finally, Steinhorn and Petasky aver that the government offered insufficient evidence to prove that the two believed the gold would travel in interstate commerce. The transcripts, however, reveal that this claim is without merit.
 
 III.
 
 34
 For the reasons set forth in the preceding discussion, we affirm the convictions of Steinhorn and Petasky.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 Turner was a defendant in three state charges alleging he stole approximately $180,000 from the Piercing Pagoda jewelry store. He retained Steinhorn to represent him
 
 
 [2]
 The failure to raise this claim was with respect to both aspects of the Fifth Amendment analysis, treating the Reports as either a civil requirement for the corporate entity Metro Broker or treating them as a requirement of a criminal regulation applicable to Petasky as an individual